In the Matter of JOSEPH B. NEWHOFF, Deceased. LAWRENCE A. COHEN et al., Appellants; FLORENCE NEGIN et al., Respondents. (And Three Other Proceedings.)

Second Department, March 25, 1985

**APPEARANCES OF COUNSEL**

*Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P. C. (John J. Barnosky* and *Dolores Fredrich* of counsel), appellant *pro se* and for Lawrence A. Cohen, appellant.

*Ernest J. Belfi (Paul V. O'Brien* of counsel), for Florence Negin and another, respondents.

*Conroy, Giorgio, dePoto & Merritt (William Merritt* of counsel), for Paul J. Newhoff and another, respondents.

### OPINION OF THE COURT

MANGANO, J.

The primary question to be resolved on these appeals is whether the Surrogate properly surcharged the appellant Cohen, as trustee and cotrustee of certain testamentary trusts, for losses incurred as a result of his investment of a substantial portion of each of the trust funds in Real Estate Investment Trusts (hereinafter REITS), which were primarily involved in construction and development loans.

I

The decedent, Joseph B. Newhoff, died on April 7, 1972. He was survived by his wife, Florence Newhoff (who subsequently remarried and is hereinafter referred to as Florence Negin), his mother Ruth Newhoff, and two children who were, at the time of decedent's death, 22 and 18 years of age, respectively.

The decedent's will and first codicil left all of his personal effects, household goods, jewelry and automobiles, as well as his residuary estate, to his wife. The will also created three trust funds (hereinafter trusts A, B and C) to receive the proceeds of certain life insurance policies on decedent's life. Each of the trusts were originally funded with the sum of $77,643.52.

Trust A was established for the benefit of decedent's wife, Florence Negin. Income was payable to her during her life, and she was given a general power of appointment exercisable by will over the principal of the trust. In addition, the trustees were directed to pay $10,000 outright to Florence Negin as soon as the trust was funded.

Trust B was created for the benefit of the decedent's two children, Paul and Ellen. The trustees were directed to pay income to the beneficiaries quarter-annually, and one third of the principal was payable to each child upon attaining the age of 25 years. An additional one half of the then remaining principal was to be distributed at age 30, and the balance was directed to be distributed at age 35. In addition, the trustees were authorized to withdraw from principal such amounts as they "in their discretion may from time to time determine as proper for the general maintenance, support and education of the beneficiaries of this [trust] B. It is my desire that my Trustees shall act with liberality and generosity as I would were I living".

Trust C was established for the benefit of the decedent's mother, Ruth Newhoff. Income was payable to her for life, with the principal to be paid into trust B, upon her death. Ruth Newhoff was also given the right to demand up to $3,000 annually from the principal.

The decedent's attorney, appellant Lawrence A. Cohen, was named coexecutor, together with decedent's business associate and family friend, George Angels. Cohen was also named as sole trustee of trusts A and C and cotrustee together with Angels of trust B. The will did not contain any instructions regarding investments to be made by the executors or trustees.

The record indicates that of the initial principal sum of $77,643.52 in each trust corpus, the appellant trustee invested, during the period between November 1972, and January 1973, over $40,000 from the corpus of trust A, over $50,000 from the corpus of trust B, and over $50,000 from the corpus of trust C, in four REITS which were primarily involved in construction and development loans; investment in a fifth such REIT occurred late in 1973 and early 1974.

In November 1978, Cohen filed amended accounts as executor, trustee and cotrustee. Angels, the cotrustee of trust B, adopted Cohen's account for that trust in November 1978. Decedent's wife, mother, and two children filed objections to all of the accounts in November 1978, arguing, *inter alia*, that Cohen and Angels had acted imprudently in certain of their investments of trust funds. Specifically, the objectants contended that (1) the trusts had suffered losses due to Cohen's investment of a substantial portion of each trust corpus in the aforenoted REITS and (2) these investments were highly speculative and imprudent.

In a reply, Cohen denied these allegations and, as an affirmative defense, alleged that decedent's two children had executed releases discharging him and Angels from all claims relating to his management of trust B.

II

Hearings on the contested accounting proceedings were conducted before Surrogate Bennett during the period commencing in early December 1979 and terminating at the end of May 1980. On July 31, 1980, Surrogate Bennett retired without rendering a decision. Pursuant to SCPA 209 (9), Acting Surrogate Delin reviewed the record without a hearing de novo, and rendered a decision dated December 18, 1980. In his decision, the Acting Surrogate took note of the fact that (1) the financial losses

suffered by the three trusts were directly attributable to the trustee's retention of the subject REITS during a period of general "economic decline", and a "falling market" and (2) a trustee in such a situation could "be absolved from liability on the grounds that he could not foresee the economic downturn" (*Matter of Newhoff*, 107 Misc 2d 589, 592-593). However, the Acting Surrogate held that this rule was subject to the proviso that "the initial investment was proper" (*Matter of Newhoff, supra*, p 593). In resolving this latter issue, the Acting Surrogate held that the appellant trustee's initial investments in November 1972 in the REITS were imprudent. In so holding, and surcharging the appellant for the resulting losses, the Acting Surrogate stated (*Matter of Newhoff, supra*, pp 593-595):

"The prudence of an investment must depend upon a balanced consideration of each individual investment at the time that it was made (*Matter of Bank of N.Y.*, 35 NY2d 512). Important considerations for a trustee are capital structure, competency of management and whether the stock is a seasoned security with a history of productive return over a long period of time (*Matter of Hall*, 164 NY 196; *Matter of McDowell*, 102 Misc 275, mod 184 App Div 646, mod 230 NY 601; Current Investment Questions and the Prudent Person Rule, 13 Real Property, Probate and Trust Journal, 650, 657).

"The expert who testified on behalf of Cohen stated that the REITS in question were merely extensions of investments which the banks had made prior to the time that these trusts began to develop. The fact is, however, that the REITS in which the trustees invested existed in their current form for only a short period prior to the time that they made the investments and there was no solid history of a productive return upon which they could base a decision that each REIT was a proper investment. The following dates are those on which the trusts were organized according to Standards & Poors NYSE Stock Reports: Continental Illinois Realty, 1969; Diversified Mortgage Investors, 1969; Midland Mortgage Investors, 1969; State Mutual Investors, 1970; Tri-South Mortgage Investors, 1970.

"The prospectus reports which the trustee offered in evidence and on which he relied warned that the particular REITS were subject to the substantial risk of adverse changes in the interest rates, the availability of permanent mortgage funds, local conditions and the ability of the builder to control costs and conform to plans. Publication such as the Realty Trust Review, also in evidence, recommended the purchase of selected REITS but warned against their vulnerability to a change in interest rates
* * *

"The primary objective of a trustee should be preservation of the trust rather than enrichment of the beneficiary. The duty of a trustee is to keep the funds entrusted to him in a state of security productive of income and subject to future recall (*Matter of Young,* 249 App Div 495, affd 274 NY 543). A trustee should strive for reasonable income and preservation of the principal of the trust (EPTL 11-2.2; 3 Scott, Trusts, § 227.5). He may not speculate.

"Moreover, a trustee must always keep in mind the purpose for which a trust was created. Particularly, in the case of the children's trust it is clear that the decedent was concerned about preservation of the principal, his codicil specifying that the trust was not to terminate until each child reached the age of 35 * * *

"Cohen claims that he should not be surcharged because he secured information from various sources as to the investments made. However, this is only one aspect of the prudent man rule (EPTL 11-2.2). Having made the investigation, the trustee is under a duty to exercise a reasonable degree of skill in selecting an investment (*Matter of Hall,* 164 NY 196, *supra*), and as previously emphasized, his primary concern should be the preservation of the funds invested and the income to be derived from the investment. Measured against this standard, it is clear that trustee Cohen selected investments in an effort to maximize income without regard to the magnitude of risks involved (see Johnston, Prudence in Trust Investment, 8 Univ of Mich J of Law Reform, 491, 495). Taking all the facts into consideration, the court concludes that the investments in REITS were imprudent for these trusts.

"Numerous jurisdictions follow the rule set forth in the Restatement of Trusts (2d), which requires a fiduciary to refrain from investing a proportionately large part of the trust estate in a particular type of security (Restatement, Trusts 2d, § 228). New York does not require diversification (see, e.g., *Matter of Montant,* 72 NYS2d 318, affd 274 App Div 751; *Matter of Beebe,* 52 NYS2d 736, affd 268 App Div 1051).

"The New York cases do hold, however, that the investment of a large portion of trust funds in a single security coupled with other elements of hazard may be the basis of a finding of imprudence (*Durant v Crowley,* 197 App Div 540, affd 234 NY 581)".

The Acting Surrogate rejected the appellant Cohen's affirmative defense with respect to the losses suffered by trust B, holding:

"Where the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either because of superior knowledge of the matter derived from a fiduciary relationship or from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable, the transaction is presumed void and it is incumbent upon the stronger party to show that no deception was practiced, no undue influence was used and all was fair, open and voluntary (Cowee v Cornell, 75 NY 91; Matter of Ungrich, 115 Misc 762).

"Only where a fiduciary furnishes his cestui with a full and fair statement of what he has done and requests approval or disapproval may he obtain a release which will prevent the cestui from holding the fiduciary liable (Matter of Amuso, 18 Misc 2d 936).

"Here the trustee attempted to procure releases from Paul and Ellen without giving them an accounting or any meaningful information regarding the assets which were held in trust despite the fact that Paul had made frequent requests for information. He was met with evasive tactics. The beneficiaries of this trust could not approve the acts of the trustees in light of the fact that most information regarding the management of the trust was withheld from them. The letters signed by Paul and Ellen are ineffective to release the fiduciaries from liability for losses to Fund 'B'."

Finally, the Acting Surrogate disallowed trustee's commissions, holding:

"The denial of a fiduciary's commissions does not necessarily accompany a surcharge for losses to the estate. Whether a trustee will be denied commissions depends upon the facts and circumstances of each case and is in the discretion of the court (Matter of James, 23 App Div 2d 529).

"A trustee owes a duty of undivided fidelity to the beneficiaries of the trust. Where that duty has been deliberately breached, he should be denied commissions (Matter of Sharp, 140 Misc 427). Likewise, the display of indifference by a fiduciary towards the execution of his duties may result in a denial of commissions ordinarily reserved for one who has done a satisfactory job (Matter of Schaich, 55 App Div 2d 914).

"Here it is clear that while Trustee Cohen undertook his duties with the utmost good faith, as the assets of the trust begin to diminish he adopted a course of conduct which was antagonistic to the beneficiaries by refusing to account to them or provide information regarding the status of the investments."

In a subsequent decision, Surrogate Radigan disallowed payment by Cohen of attorneys' fees which were incurred in defending the contested accounting proceeding. With respect to this issue, the Surrogate held:

"The nature of the services rendered as indicated by the affidavit, were in connection with the objections to the executors' and trustees' accounts, with emphasis on research regarding the propriety of investments in Real Estate Investment Trusts.

"In the present case, almost all of the objections to Lawrence Cohen's accounts were sustained * * * Under the circumstances, the services rendered on behalf of the fiduciaries in defending them with regard to matters on which they were surcharged may not be paid from the estate (Matter of Hildreth, 274 App Div 611, affd 301 NY 705; Matter of McDowell, 202 App Div 568; Matter of Chiesa, 23 AD2d 562) * * *

"Lawrence Cohen is directed to refund $24,918.97 to the trusts in the amounts withdrawn from each trust * * * and if he fails to do so within 20 days of the service of the decree, his attorneys are to refund said amount (SCPA 2110 [3]), without prejudice to any cause of action which the firm may have against Mr. Cohen for payment for services rendered".

The decree appealed from, dated May 18, 1983, *inter alia,* incorporates these determinations.

### III

The cardinal rule regarding the conduct of a fiduciary holding funds for investment is the "prudent man rule". This rule was formulated in the 1830 case of *Harvard Coll. v Amory* (9 Pick [26 Mass] 446, 461), wherein the Supreme Court of Massachusetts observed: "All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested."

In 1869, the New York Court of Appeals in *King v Talbot* (40 NY 76, 85-86), adopted the prudent man rule noting:

"[T]he trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.

"This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made.

"It, therefore, does not follow, that, because prudent men may, and often do, conduct their own affairs with the hope of growing rich, and therein take the hazard of adventures which they deem hopeful, trustees may do the same; the preservation of the fund, and the procurement of a just income therefrom, are primary objects of the creation of the trust itself, and are to be primarily regarded."

Again, in *Matter of Hall* (164 NY 196, 200-201, *supra*), the Court of Appeals stated: "In *Mattocks v. Moulton* (84 Maine, 545) it was held that in the investment of trust funds the trustee must exercise *sound discretion* as well as good faith and honest judgment. The court said: 'It will be generally conceded that a mere business chance or prospect, however promising, is not a proper place for trust funds. While, of course, all investments, however carefully made, are more or less liable to depreciate and become worthless, experience has shown that certain classes of investments are peculiarly liable to such depreciation and loss. These, of course, would be avoided by every prudent man who is investing his own money with a view to permanency and security rather than chance of profit. A trustee should, therefore, avoid them, even though he sincerely believes a particular investment of that class to be safe as well as profitable.' In *Dickinson, appellant* (152 Mass. 184), a trustee was held liable for an investment in Union Pacific railroad stock. It was there said: 'Our cases, however, show that trustees in this commonwealth are permitted to invest portions of trust funds in dividend-paying stocks and interest-bearing bonds of private business corporations, *when the corporations have acquired, by reason of the amount of their property, and the prudent management of their affairs, such a reputation that cautious and intelligent persons commonly invest their own money in such stocks and bonds as permanent investments.*'"

In 1970, the Legislature repealed EPTL 11-2.2 (a) (1) which then authorized a fiduciary holding funds for investment to invest such funds in enumerated classes of securities, and instead adopted the "prudent man" rule in the new statute, as follows (EPTL 11-2.2 [a] [1]): "A fiduciary holding funds for investment may invest the same in such securities as would be acquired by prudent men of discretion and intelligence in such

matters who are seeking a reasonable income and preservation of their capital".

An explanation of the workings of the "prudent man" rule is contained in the memorandum of the New York Department of Banking filed in support of the legislation (Memorandum of State Department of Banking, 1970 NY Legis Ann, at 154, 155). The memorandum states: "The prudent man rule is not a license to speculate. Instead, it applies the ultimate test of prudence to each investment. This rule served well in Massachusetts for 135 years and for shorter periods in 30 other states, while beneficiaries and remaindermen of New York funds have suffered because of New York's more restrictive statutes. It is especially in New York, where financial information and advice and competent legal advice are readily available, that fiduciaries should be expected to know or to learn how to invest prudently."

Viewed within this perspective, it is our view that the Surrogate was correct in holding that Cohen's investment of a substantial portion of each of the trust funds in the particular REITS involved at bar was imprudent.

In a Standard & Poor's Industry Survey dated November 9, 1972, a REIT is defined as follows:

"The REIT is an unincorporated organization that issues shares of beneficial interest rather than common stock * * * [T]hey are traded in the open market and are not redeemable by the trust * * * [M]odern real estate investment trusts got their start in 1960 * * *

"Basically, trusts can be divided into three categories: (1) equity, (2) mortgage, and (3) combination (also called hybrid or balanced).

"The equity trust is ownership oriented and invests in various income-producing properties * * * It profits from the normal excess of rents over operating costs * * *

"While mortgage trusts can invest in a large variety of short-term, intermediate-term, and long-term first or second (junior) mortgages and related investments, construction loans comprise the largest portion of investments * * * These [construction] loans finance the erection of various income-producing properties * * * Second in popularity to construction loans are development loans * * * which finance the acquisition of unimproved land and its development into finished sites * * *

"Dividends and capital gains are taxable as such to stockholders. Payments in excess of earnings (made by many equity trusts and combination trusts) are treated as a tax-free return of

investment capital \* \* \* Distributions are not eligible for the $100 dividend exclusion for individuals".

The five REITS invested in by the appellant Cohen were all essentially construction and development type (C & D) trusts. At the time of Cohen's initial investments in them, their portfolios were as follows: (1) Diversified Mortgage Investors, 65% C & D loans, (2) Midland Mortgage Investors, 100% C & D loans, (3) State Mutual Investors, 76% C & D loans, (4) Tri-South Mortgage Investors, 100% C & D loans and (5) Continental Illinois Realty (initially purchased late in 1973), 90% C & D loans.

In describing the risks involved in investing in this particular type of REIT, the objectants' expert, who worked as a business consultant in real estate investment trusts and who was involved in the publication of Audit's Realty Trust Review, a news analysis of securities of REITS, testified that:

"The construction and development Trust \* \* \* is lending more on a plan, on a proposal, because the real estate that becomes the ultimate security for its loan is only partially and to a minor extent in being at the time the application for the loan is made and considered and granted \* \* \*

"So the construction and development lender or Trust is more than just a lender, he is really to a considerable extent a venturer in the project \* \* \*

"So he is making more of what you would call a business loan \* \* \* because he is depending to a far greater extent than the long-term lender or the property buyer on the ability, skill, honesty, experience and so forth of the borrower \* \* \*

"The construction and development lender is really the equivalent in terms of venture capital of the startup venture capital investor or lender."

The objectants' expert also testified that "construction and development lending is probably the riskiest lending in the real estate lending business and you have in each of the prospectuses that are issued for public securities of these Trusts a rather extensive enumeration of risks".

In addition to the fact that the five REITS in the case at bar were only organized a few years before the instant investments in them were made, and were involved in the high risk area of construction and development loans, they were not, contrary to the argument of Cohen, widely held by financial institutions (Standard & Poor's Stock Guide [Sept. 1972]). Moreover, the documents which were allegedly read by Cohen, and which were readily available to fiduciaries before he made his decision to

invest in the instant REITS in late 1972 and early 1973, indicated that (1) the trusts were not insured or guaranteed, (2) many of the REITS had "run into earnings snags" and had not been "too favorably received" and (3) some mutual fund portfolio managers had "written off REITS as non-performance vehicles" (Audit's Realty Trust Review, Oct. 30, 1972). Finally, while Cohen argued that the REITS were highly popular, he admitted that their attractiveness was the result of their higher income yield, and the record confirms that he did not sufficiently consider the risks involved regarding the preservation of the principal of each of the trusts.

In *First Alabama Bank of Montgomery v Martin* (425 So 2d 415 [Ala], *cert denied* 461 US 938) the Supreme Court of Alabama upheld a finding that the defendant trustee breached its duty to preserve the trust corpus while striving for a regular income by investing in six REITS, including Midland Mortgage Investors, one of the REITS involved in the instant case.

In summarizing the evidence as to the imprudence of the investment in the six REITS, the Supreme Court of Alabama noted (*First Alabama Bank of Montgomery v Martin, supra,* p 422):

"Questions were raised as to whether REIT's are safe trust investments. Kenneth Campbell, an expert witness for First Alabama, testified that the purchases of the REIT's were prudent investments. Yet he had called REIT's 'shaky legal undertakings' in his book, *New Opportunities in Real Estate Trusts* 29 (1978).

"Testifying for the plaintiffs, Dr. Johnston stated that REIT's were risky investments. He applied a test set out by Benjamin Graham in his book *Security Analysis* (4th ed. 1962) * * *

"Johnston testified that Graham's standards required one to look at the record of a REIT for a period of seven to ten years before making the investment, in order to determine the ratio of income to fixed charges. This was impossible here, however, because all of the REIT's were 'too new' to apply this test. Johnston concluded that all six of the REIT's failed to meet the test suggested by Graham. Johnston concluded it was a poor decision to purchase REIT's because there were other options available which were less risky.

"The plaintiffs also offered the prospectuses of the REIT's, which contained several pages of risk factors. These risk factors pointed out: (1) That the issuers were mortgage trusts engaged in making high-risk development and construction loans; (2) the competition in that field * * * Plaintiffs' evidence showed that

the REIT's were making high-risk loans dependent upon the borrower's ability to pay. The plaintiffs contended that if the borrower had good credit, it could borrow directly from the bank and not have to pay the REIT fee."

In contrast to the REITS in *First Alabama Bank of Montgomery v Martin (supra)*, whose flaws closely mirror those involved in the case at bar, the Supreme Judicial Court of Massachusetts (Essex) held in *Chase v Pevear* (383 Mass 350, 419 NE2d 1358, 1367), that a trustee's initial investment, during the period 1970-1972, in a REIT which (1) was formed in 1962, (2) was "the nation's largest and strongest" in assets and (3) was "widely held by institutional investors", was proper.

The contrast between the particular REIT involved in *Chase v Pevear (supra)*, and those involved in *First Alabama Bank of Montgomery v Martin (supra)* and the case at bar, cannot be more striking. Accordingly, we hold that the Surrogate was correct in finding that the trustee acted imprudently in his initial investments in the subject REITS.

With respect to Cohen's affirmative defense, the evidence adduced at trial supports the Surrogate's conclusion that the releases signed by respondents Paul Newhoff and Ellen Beth Newhoff, were ineffective to absolve Cohen for his lack of prudence in investing a substantial portion of the principal of trust B in the subject REITS (*Cowee v Cornell,* 75 NY 91, 100; *Matter of Amuso,* 18 Misc 2d 936).

Finally, we have reviewed the appellants' arguments concerning the Surrogate's remaining determinations and find them to be without merit (*Matter of James,* 23 AD2d 529; *Matter of Caffrey,* 254 App Div 684; *Matter of Sharp,* 140 Misc 427, 429; *Matter of Della Chiesa,* 23 AD2d 562; *Matter of McDowell,* 202 App Div 568; *Matter of Kramer,* 70 NYS2d 239, 248; SCPA 2110 [3]).

Titone, J. P., Weinstein and Brown, JJ., concur.

Decree of the Surrogate's Court, Nassau County, dated May 18, 1983, affirmed insofar as appealed from, with one bill of costs payable by appellants personally to respondents appearing separately and filing separate briefs.