OPINION OF THE COURT
Arnold F. Ciaccio, S.
In this accounting proceeding, the petitioner, Lincoln First Bank, N. A. (as successor and itself having been succeeded in later years), seeks judicial settlement of its account as coexecutor of the estate of Rodney B. Janes covering the period from July 3, 1973 to February 11, 1980. The petitioner seeks settlement of a supplemental accounting covering a period from February 11, 1981 through June 30, 1994. Extensive objections have been filed to the accounts by the executor of the estate of Cynthia W. Janes, the decedent, Rodney B. Janes’ surviving spouse, now herself deceased, and by the Attorney-General of the State of New York in its capacity as representative of the ultimate charitable beneficiaries of decedent’s estate. Mrs. Janes’ estate and the Attorney-General will hereinafter be referred to as the objectants. The objectants seek to surcharge the petitioner on the basis of alleged imprudence in estate investment management causing the losses sustained by the estate’s portfolio; they seek damages for what *745 is alleged to be negligent administration of the estate characterized by indifference in action, and the failure to make full and complete disclosure to the widow and as well as to the widow and as well as to the charities as income or residual beneficiaries.
Rodney B. Janes died on May 26, 1973. He had been a New York State Senator for some period of years and a successful businessman. At his death he had amassed a sizable estate. He was survived by his wife Cynthia W. Janes as his sole distributee. The couple was childless. Mrs. Janes was 72 years of age at the time of her husband’s death. The decedent’s will dated August 7, 1963 and codicil dated August 6, 1969 were admitted to probate on June 6, 1973 at which time letters testamentary were issued to the Lincoln First Bank and Mrs. Janes as coexecutors. Letters of trusteeship issued to the bank alone.
In brief summary, the decedent’s will, in addition to several modest monetary bequests, left one half of the adjusted gross estate to his widow in a marital deduction trust with the balance divided into two other trusts, one half with income for the benefit of the widow and on her death with the trust principal pouring over into the third charitable trust. The estate’s assets in addition to two residences, one in Pittsford, New York, and one in Florida, consisted of marketable securities and bank deposits. It appears that at the date of death the marketable securities had a value of $3,225,951. Included in the portfolio of securities were 13,232 shares of the common stock of the Eastman Kodak Company (hereinafter EK). Those shares of EK had a date of death value of $135 per share or $1,786,733. It is not controverted that the EK stock represented slightly in excess of 71% of the total value of the estate’s portfolio of securities.
objectants’ position
The bank’s petition for judicial settlement of its accounts was not filed until August of 1981. During the eight-year period of the bank’s executorship, the EK stock dropped in value to approximately $45 per share from a high of $148. It is the objectants’ position that Chase failed to act prudently to prevent the losses incurred by the estate and that as such their administration of the estate was violative of EPTL 11-2.2 (a) (1). That section then and now is referred to as the "Prudent Man’s (Person’s) Rule of Investment” (Prudent Man *746 Rule). The objectants aver that the bank’s inaction and indifference justifies the imposition of a surcharge on it for the postdeath losses incurred by the estate. (Matter of Donner, 82 NY2d 574 [1993].) It is asserted further that at no time did the bank ever disclose to the widow Janes nor the charities the exact dollar amount of the losses. It is objectants’ position that the lack of full and complete disclosure was a facet of deception practiced by the trust officers at the bank in the handling of the estate.
petitioner’s position
The petitioner takes the position that the essence of the objections is nothing more than a hindsight observation that the value of the estate diminished. It avers that there is no basis in law for a surcharge and that the bank continuously monitored and serviced the assets of the estate and made a conscious determination to retain the concentration of the stock of a "great company” with a "great track record” of "financial strength”, "growth” and "business prospects”. The temper of the times and the facts known to the bank at the time it made investment decisions does not permit, they claim, a conclusion that the petitioner acted imprudently in violation of the Prudent Man Rule.
It is observed at this point that during the period in question the widow Cynthia Janes had been represented by her personal attorney, John Remington, himself a partner in the law firm of Nixon, Hargrave, Devans & Doyle, the firm of attorneys who represented and still represent the bank. Remington had been a partner in that firm from 1962 until his retirement in July of 1974. As noted, Mrs. Janes died in 1986. It is also observed that John Remington, Esq. had been a president of Lincoln Rochester Trust Company, a predecessor to the petitioning Lincoln First Bank.
LAW
The Prudent Man Rule has its derivation in the common-law rule adopted in King v Talbot (40 NY 76 [1869]). Prior to the enactment of EPTL 11-2.2 in its current form in 1970 much stricter investment standards existed. Fiduciaries could invest in items on what was known then as the "legal list” that consisted of conservative nonrisk securities only. With the adoption of EPTL 11-2.2 New York joined the jurisdictions adopting the Prudent Man Rule of investment which required *747 fiduciaries to invest estate, trust or guardianship funds "in such securities as would be acquired by prudent men of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital” (EPTL 11-2.2 [a] [1]). A legion of cases have turned on the various interpretations of the rule, in general it having been defined as a test of the fiduciary’s conduct not its performance (Matter of Bank of N Y., 35 NY2d 512; Matter of Morgan Guar. Trust Co., 89 Misc 2d 1088; Stark v United States Trust Co., 445 F Supp 670). The fiduciary must be cautious and avoid risk and does not have a license to speculate (Restatement [Second] of Trusts § 174). What is clearer than any aspect of the test to be applied is that whether an investment is prudent or not is a question of fact. (Matter of Clarke, 12 NY2d 183; Matter of Yarm, 119 AD2d 754; Matter of Fleschner, NYLJ, Apr. 26, 1985, at 13, col 1.) Equally clear as well is that within the framework of the prudent man investment standard is the requirement that the fiduciary maintain a balance between the rights of income beneficiaries with those of the remainder-man. (EPTL 11-2.1 [a] [1]; see, colloquy 3A Warren’s Heaton, Surrogates’ Courts § 264 [2] [6th ed].) A fiduciary needs to analyze the risks of a portfolio, the marketability of the holdings, its volatility, and the market conditions then and there prevailing. The court is obliged to consider whether the fiduciary invested in or maintained an unusually large proportion of the fund in a single type of security. (Matter of Newhoff, 107 AD2d 417; Durant v Crowley, 197 App Div 540, affd 234 NY 581; Matter of Silberman, NYLJ, June 17, 1975, at 18, col 3.) Generally allied with the consideration of an unusually large portion retained in a single security which may be termed a concentration (to be developed later in this decision) is the issue of diversification. In that respect it is clear that the failure to diversity by itself is not an act of imprudence. (See, Matter of Mendleson, 46 Misc 2d 960.) Courts have tended to apply a different (more relaxed) standard when the fiduciary retains assets owned by the decedent as distinct from those that the fiduciary has acquired. (Matter of Clark, 257 NY 132; Matter of Newhoff, supra; Stark v United States Trust Co., supra.) Such retention, however, does not exempt the fiduciary from the Prudent Man Rule, so where a fiduciary retains assets it must exercise prudence in doing so. (Matter of Hahn, 62 NY2d 821.)
Where beneficiaries consent to the fiduciary’s retention of an investment the court may deny a surcharge providing that *748 the consent was valid. (See, Matter of Ryan, 291 NY 376.) It is generally held that such consent must be informed consent. Fiduciaries should obtain signed consents or releases after giving meaningful information and advice to the beneficiaries. (In re Cohn’s Will, 40 NYS2d 892 [1943]; Matter of Kern, 159 Misc 682.)
THE WILL, THE TRUST & EARLY ADMINISTRATION
Decedent’s will, in addition to the minor monetary bequests, provided in principal measure for the creation of three trusts, hereinafter referred to as the marital trust, the split interest trust and the charitable trust. Chase Lincoln Bank was designated to serve as sole trustee of each trust.
The marital trust created under paragraph tenth a of the will was established in typical marital deduction form embracing approximately 50% of the estate. It provided for the income to be paid to Mrs. Janes during her lifetime. It had an explicitly liberal provision to invade principal for "the comfort, support and maintenance of Mrs. Janes”. (Will, para tenth.) Any remaining principal in the marital trust was subject to a testamentary , power of appointment in Mrs. Janes, and on her failing to make such an appointment over to the following charitable trusts. The split interest trust created by paragraph tenth b-1 and referred to as the b-1 trust comprised about 25% of the estate. It provided for income to be paid over to Mrs. Janes for life and upon her death any principal remaining to be added to the charitable trust — the b-2 trust.
The final 25% of the residuary estate was given over to the charitable trust created by paragraph tenth b-2. This was otherwise described as the Rodney B. Janes Memorial Trust to make annual distributions to selected charities.
The petitioner had been the decedent’s principal banker during his lifetime and was well aware of the decedent’s business as such. Ostensibly aware of the assets of the impending estate, it moved rather quickly after death. Richard Young was designated as the administrative officer and Ellison Patterson as the investment officer. They had the primary responsibility to manage the estate and the portfolio. The assets were readily marshalled and liabilities were inventoried.
While it is averred that the beneficiary’s financial needs and other cash needs were quickly identified, it is equally uncon *749 troverted that the charities were never consulted in that regard.
On September 5, 1973, Mr. Patterson and Mr. Young met with Mrs. Janes and her counsel, attorney Remington along with another attorney from the Nixon office, Andrew Kiley. At the meeting, the cash needs of the estate were identified and some indications were obtained concerning Mrs. Janes’ income requirements. At this juncture, the estate’s holding together with indicated income yields were set forth. The upshot of the meeting of September 5, 1973 was a recommendation from Mr. Patterson, the investment officer, to sell 1,232 shares of the EK stock, certain municipal bonds and to liquidate some cash equivalent to make up the cash needed in the estate to pay immediate debts, executors commissions, and attorney fees.
Patterson recommended retaining the balance of the securities in the estate including what was now 12,000 shares of Eastman Kodak stock, in excess of 60% of the portfolio. Patterson testified that Mrs. Janes agreed with each of the Patterson recommendations to the extent that she "loved Kodak” and her husband "loved” Kodak. As appears later, the bank’s reliance on these expressions was part of the basis to retain a concentration in EK. The loose statements made by Mrs. Janes can hardly be equated with a consent to the retention. The record is devoid of any signed consent, further communications by her, acknowledged or otherwise.
THE "CONCENTRATION”
It is the circumstance and the status of the concentration that go to the heart of the determination of prudence. That there was a concentration in the EK holding is beyond dispute. Several of the exhibits generated from the bank’s own records — monthly account statements and other items — all bear the bank’s rubber stamped admonition "concentration”. While the record does not to any great extent or detail develop just exactly what was the portent, meaning or impact of the bank’s signal of "concentration” on a portfolio, nonetheless certain aspects become apparent. The court’s own question of the bank expert Dessauer elicited from him that a concentration was in his view "anything over a 20% holding in a single stock in a portfolio”.
The witness Patterson, the bank’s investment manager in charge of the Janes portfolio, testified at some length and *750 detail on the subject. It was his view in synopsis that while a "concentration” signal on a portfolio required a special or certain kind of scrutiny to that particular holding that such a holding, albeit a concentration, was not undesirable if three particular conditions existed. Patterson testified that the criteria for condition No. 1 was the nature and quality of the stock. It was his view that the EK stock, being a growth blue chip stock with an outstanding track record not only as to dividends but as to debt and industry standing qualified as passing condition No. 1. There is no challenge by the objectants as to compliance with condition No. 1 and the court finds that this condition did exist.
Condition No. 2, according to Patterson, was that the stock or holding paid an acceptable rate of income. That the EK stock in 1973 had a yield of 1.1% is again uncontroverted. The Patterson testimony and indeed the thrust of the bank’s position vis-á-vis this income level is that yield in its broader form involves not only the actual dividend ratio to the price but also involves the growth nature of the stock and the probabilities for future appreciation. Accordingly, in Patterson’s view, the "income” — albeit 1.1% in 1973 — qualified the EK for purposes of condition No. 2. With this position, the court does not agree. Given the age, health and status of Mrs. Janes in 1973 and the fact that the ultimate beneficiaries were charities, the income yield was insufficient and unacceptable. The expert testimony makes it clear to the court that the EK holding did not satisfy Patterson’s own definition of condition No. 2.
The third condition in the Patterson testimony that justified a concentration in a portfolio was that the customer, in this instance, the beneficiaries, consented to or acquiesced in the retention of the holding even in its concentrated percentage. As to the ultimate charitable beneficiaries, again it is without contradiction that not only did they not acquiesce or consent to the retention of the EK in concentrated form, but neither were they given the information with respect to the account by way of disclosure or advice at any time. With respect to Mrs. Janes, the bank’s position is that she was put on notice at all stages of the accounting and for any decisions that were made. As indicated above she attended the September 3, 1973 meeting and indicated a romanticized filiation or affinity for the EK stock. Her affixing of a signature to a document can hardly be characterized as an acknowledged or informed consent or ratification by the beneficiary to retain the stock. *751 The bottom line with respect to Mrs. Janes is that she was an unsophisticated elderly woman with a clear lack of acuity in financial matters. To establish ratification by a beneficiary it must be shown that the ratification was done with knowledge of material facts. (Matter of McDonald, 201 Misc 844; Matter of Newhoff supra.) The court is unwilling to strain itself to equate her "love” for EK for consent; the court cannot find an informed consent as envisioned in McDonald nor Newhoff (supra).
The assertion by the bank that the "customer” here was the following trusts (Lincoln itself as trustee) is specious. The real parties in interest to whom the bank owed the ultimate fiduciary duty was Mrs. Janes and the charities. Consider the impact of SCPA 2210 (10) which requires jurisdiction over the persons interested in the trust. The court finds there was no such acquiescence or consent to retention of the EK concentration. In doing so, it confirms what may be termed the "law of the case” given the prior order of Acting Surrogate Leonard E. Maas dated July 1, 1982 which denied a motion to dismiss the widow’s objections based on her consent to retention.
THE BANK’S PERFORMANCE
The record of the bank’s performance and conduct from August 1973 through the balance of its accounting period displays a pattern of routine reviews, consultations and monitoring of the portfolio. The bank offers testified in synopsis that close attention was continuously paid to the EK stock, its operating results and analysts’ reports. Both Patterson and Young participated in formal semiannual reviews of the estate by other trust department officers and committees.
Notwithstanding turbulent world-wide economic conditions including an OPEC oil embargo, all of which resulted in a monumental and precipitous decline in the stock market during the 1973-1974 period, the bank’s position continued to be one to retain the Eastman Kodak stock in its concentrated form. In that one year the EK stock dropped from approximately $115 a share to about $60 a share. In summary, the bank’s position in demonstrating prudence is that the retention of the EK was part of a conscious and studied investment plan. In reality, the bank’s responsiveness to the admittedly turbulent and precipitous tenor of the times (1973) was to do nothing. To assert that mere review, analysis, and monitoring satisfies the standard of due care by a prudent person where *752 action and activity are indicated, tests the court’s sense of reason and logic and more importantly flies in the face of the surcharge cases heretofore cited.
The bank places a great deal of justification in its position in terms of having performed "prudently” on a Federal District Court case entitled Stark v United States Trust Co. (445 F Supp 670, supra). That case, while remarkably similar in terms of the charges and counter charges as well as the time frame during which the fiduciary’s conduct came under scrutiny, is otherwise distinguishable on it facts. In Stark (supra), the veteran Federal District Court Judge Edward Weinfeld reviewed at great length the law of the State of New York as it pertained to fiduciary responsibility for inter vivas trusts created by an individual in 1965 and containing a portfolio of various common stocks. The trust beneficiaries sued to recover losses allegedly caused as a result of the trustee’s lack of prudent management. There the court held that the evidence had established that deliberate, informed and experienced attention and professional judgment were brought to play with respect to each of the investment decisions that were made by the trustee and it did not establish imprudence which would give rise to liability for the benefit of those beneficiaries. The court discussed the legal standards in the State of New York with respect to the duties and responsibilities of trustees and other fiduciaries, in terms of decision making; attention to market conditions; rises and falls in a volatile market; retention as opposed to sales; diversification; the standard of care; imprudence in retaining securities in a sharply dropping market; and even to the extent of describing the effect and impact of an OPEC oil embargo on a general world-wide economic malaise occurring in the early 1970’s.
There is, however, missing from Stark facts any reference to a concentration that existed in Janes. As Judge Weinfeld appraised and exonerated the trustee in Stark (supra), for its retention of individual stocks notably Clorox and Coleco, there is no indication whatever in that record that any stock or those stocks or any holdings for that matter were held in concentration status. Concentration was simply not an issue in Stark.
Finally, and with respect to the distinguishing aspects of Stark (supra), the trust agreements themselves in Stark provide enough grounds for rejecting the plaintiff’s claims of surcharge. Those trust agreements specifically authorized the trustee in its absolute discretion to retain any property re *753 ceived in the trusts regardless of whether it constituted a disproportionate amount of the total trust corpus. It expressly provided that the trust would not be subject to criticism or surcharge for doing so. The agreement provided that "trustee shall not be held liable for loss of principal or income caused by the retention” (supra, at 672, n 5) of securities contributed by Rousseau (the settlor of the trust). Although that kind of discretion " 'does not mean . . . that [a trustee may act] recklessly or willfully abuse[ ]’ ” his discretion, nonetheless "exoneration provisions are recognized in New York law” and they "protect [the] trustee from liability absent recklessness, fraud or intentional wrongdoing”. (Supra, at 683; Carrier v Carrier, 226 NY 114; Crabb v Young, 92 NY 56; Matter of Cowles, 22 AD2d 365.) That exculpation language is not available to the bank in the instant proceeding.
EXPERT TESTIMONY
Perhaps the case for the objectants is best stated in the testimony of Loren Ross, a City of New York resident and investment manager with an impressive resume. He testified to familiarity with the accounts in the Janes estate, the will, the codicil, the internal memos, the various and lengthy interrogatories and other pretrial discovery products as well as a prospectus for the bank’s own Lincoln First’s Income Development Fund, a common trust fund managed by the bank during the same time frame.
Ross testified that his review of exhibit 65, the inner office correspondence between Patterson and Young dated August 9, 1973 setting forth the Janes portfolio, presented an immediate and enormous risk given the concentration of EK stock in that portfolio. It was his view that the risk and exposure to the retention of a concentration of EK at that level was amplified given the position and status of the beneficiaries, i.e., Mrs. Janes, her age and state of health as well as the charities involved. He testified that in his view, income and stability in this portfolio were more important than as might be the case with a younger income beneficiary. Ross concluded that he would have moved immediately and it would have been prudent to eliminate the concentration in the EK. He would have sold a considerable portion of the holding down to no more than 5% of the over-all portfolio. Ross’ criticism of the bank’s investment performance is that its record over the eight-year period of the accounting is one of inaction and watching it *754 decline over all of those years. "There was an enormous risk in that portfolio — enormous capital risk and considering the income risk to hold EK in that concentration was imprudent.”
The witness Richard Conger, an attorney with experience in several estates in the investment field but none in New York, testified along similar lines. As did Ross, Conger concluded that it was imprudent to have kept the EK concentration in the Janes portfolio notwithstanding its blue chip value. A growth portfolio was inappropriate given the needs of Mrs. Janes, her age and station in life and in consideration of the ultimate charities. His opinion was that no more than 3% to 5% of the EK holding should have been retained in the portfolio and that the reduction to that level should have been made no later than August 1973.
Another witness, Peter Gaess, duly qualified as an expert was called and then recalled following the Ross and Conger testimony. His recalling was for the purpose of reviewing various exhibits ostensibly to show the damages or loss sustained by the retention of the EK and the measure of damages which might have been determined by a comparable investment using the indices of the Standard and Poor 500 stocks, the Ibbotson Bond Index, the Lincoln Income Fund and compounding at the legal interest rate. The witness reviewed the impact of five specific sales of the Kodak by the bank over the accounting period with the conclusion that prejudgment damages with interest varied from a high of $7 million using the Standard and Poor index to a low of $4 million using compound interest at the legal rate. Of particular interest to the court was the damage calculation involving the Lincoln First Income Development Trust, a common trust fund maintained and administered by the bank itself. The damages there were calculated to be the sum of $6,080,269 — damages with prejudgment interest.
The expert presented at trial on behalf of the bank was John Dessauer, an attorney by education but with experience in the trust field working with the Security Trust Company of Rochester’s investment department from 1966 until 1971. He testified to extensive duties with large and complicated estates. This review of the Janes portfolio as it was received by the bank and administered by them in his opinion was devoid of imprudence. His opinion was that in 1973 he claimed there was an adequacy of income and a low-risk level comparatively since Kodak was an outstanding world stock, had a continuous dividend payment history and its position in the photographic *755 industry was dominant. He concluded there was no purpose in eliminating the concentration or attempting to diversify the Kodak holding. He also "liked” the EK holding since its headquarters were located in Rochester and there was ready access and high level awareness of its position. He disputed Ross’ contentions that the EK should have been sold all at once and said that in his view if it would have been prudent to sell it, it would have been sold over several months’ time.
In terms of the Dessauer testimony, the court finds three areas of that testimony troublesome. The statement by him that "diversification is unethical and a breach of fiduciary responsibility” is in error. Dessauer on another occasion testified that in his view, "a fiduciary has the same standard to a portfolio as an individual would have to his own portfolios— that he, the fiduciary, stands in the shoes of what the owner would have done.” While a misquotation or misstatement, nonetheless it is in error. It is observed that the Prudent Man Rule, the law of the State of New York, is applicable to fiduciaries and is not applicable to individuals who retain or maintain their own portfolios. Finally, Dessauer’s assertion that maintaining a "100% concentration of EK in a trust portfolio would not be imprudence” cannot be a seriously advanced expert opinion. On the state of the record and after due deliberation and for the reasons set forth herein, the court concludes that this fiduciary acted imprudently with resultant losses to the beneficiaries requiring the imposition of damages.
DAMAGES
When a fiduciary fails to perform prudently with resultant loss to the beneficiaries, the court must apply a measure of damages commensurate with that loss and, to the degree possible, make the injured party whole. (Matter of Rothko, 43 NY2d 305; Town of Evans v Catalino, 88 AD2d 780, 781; Bogert, Trusts and Trustees § 701, at 198 [2d ed rev].)
Traditionally, damages for imprudently retained securities were measured from the time the securities should have been disposed of, and the loss then consisted of the value of the securities at that time, together with interest, less the value at the time of the accounting and less any dividends or other income received from the imprudently retained securities. (2 Scott, Trusts § 212-A [2d ed 1956]; see also, §§ 205, 207, 207.1, 207.2, 209, 211; Restatement [Second] Trusts §§ 205, 206, 208, *756 209 [1959]; Matter of Garvin, 256 NY 518 [1931]; In re Davenport’s Will, 104 NYS2d 433; Estate of Talbot, 141 Cal App 2d 309, 296 P2d 848.) This computation fails however to consider how the proceeds of the sale would have performed in an appropriate prudent investment.
Accordingly, in this court’s view, to calculate damages against this fiduciary, the court must determine (1) when a fiduciary should have sold the asset; (2) the quantum of sale proceeds; (3) a standard of the performance of the proceeds of a sale in an alternative investment; (4) the interest, if any, to be charged on the losses. (Matter of Newhoff, 107 Misc 2d 589, 595-596, affd 107 AD2d 417, supra; Matter of Kellogg, 35 Misc 2d 541.)
The asset, the EK stock, should have been sold within a reasonable time. (Matter of Weston, 91 NY 501, 511; Matter of Buck, 184 Misc 29, 34, 35.) In some instances the courts have held that date of death or as soon as a fiduciary qualifies and has the authority, the securities should be sold. (Matter of Donner, 82 NY2d 574, supra.) Rodney B. Janes died May 26, 1973 and letters testamentary were issued June 6, 1973. The investment officer assigned to the Janes estate who finalized the investment strategy as of August 9, 1973 was already aware that EK stock was at a high concentration in the portfolio. EK which enjoyed an historic high in the market generated a 1% annual return. It is this court’s view on the state of the record that the bank as coexecutor was responsible and should have, as of August 9, 1973, sold that portion of the EK stock concentration bringing its presence in the portfolio to the 5% level.
The disposition of the EK on August 1, 1973 would have resulted in proceeds of $1,687,647.30 (12,087 shares sold @ $139 5/8).
USE OF INDICES
As indicated, previously, the traditional theory of damages in a case have the effect of making the beneficiaries whole, i.e., placed in the position they would have been had the trustee not breached the fiduciary duty. The Court of Appeals in Matter of Rothko (supra) endorsed that principal and when taken together with the case entitled Ashland Mgt. v Janien (82 NY2d 395 [1993]), which set guidelines permitting recovery of lost profits, it is clear that the trial court has the authority and obligation to award them. In that regard, neither the *757 difficulty of the task nor the guaranty of imprecision in results can be the basis of judicial abdication of the responsibility to set reasonable damages in a surcharge case. (Miley v Oppenheimer & Co., 637 F2d 318, 327.) The Federal Second Circuit’s decision in Rolf v Blyth, Eastman Dillon & Co. (570 F2d 38 [1978]) has embraced the principal of actual performance of the stock market as reflected by appropriate indices, and its use to measure the damages sustained for improper stock transactions. As the court has previously indicated, the witness Gaess testified at great length together with charts, exhibits 489, 491, 493, 494 tracing the loss calculations on the proceeds of sale as against separate indices, to wit: the Standard and Poor 500, the Ibbotson Intermediate Government Bond Index, the Lincoln Rochester Income Development Trust, and compound interest at the statutory rate. The damages set forth in those calculations vary from a low of $4,065,029 to a high of $7,530,547. In each instance Gaess calculated what the gross proceeds of a sale of the block of stock would have generated in August of 1973. He calculated the annual gain or loss which would have been experienced for each dollar amount of proceeds based upon the particular index being used. For each year that the stock was retained by the bank, Gaess gave the bank credit for actual dividends received and finally subtracted the amount eventually received by the bank when they sold the block of stock in question. Put more succinctly, the calculations made in the indices resulting in "a damage figure” consisted of the difference between what the estate actually received from the Kodak stock and what the estate would have received if the stock had been sold in August of 1973 and reinvested to perform in accordance with the particular index being used. The final calculation or "bottom line” represents the present value (in Oct. 1994) of the damage calculation together with interest at the legal rate.
Ultimately the assessment of the damages, once the theory is established, is without exact guidelines. Matter of Donner (supra) provides little if any assistance in the actual measurement. What is clear is that the measure of damages cannot be totally speculative, it certainly must be foreseeable and reasonably certain. (Ashland Mgt. v Janien, 82 NY2d 395, supra.) On one hand the objectants have offered the various indices maintaining in particular that the Standard and Poor 500 index represents a middle ground which would fairly and reasonably measure what the performance would have been *758 utilizing a broad spectrum of investment opportunities at that time. The petitioner argues that to utilize one or the other indices is simply the application of pure hindsight and accordingly totally speculative of what should be recovered in a surcharge proceeding such as this.
The use of indices is not without support in the authorities. (Rolf v Blyth, Eastman Dillon & Co., supra.) On the state of the entire record, it is this court’s view that the bank’s own diversified equity fund, the Lincoln First Income Development Trust, most closely reflects the type of performance indicator which establishes a standard that this fiduciary is put to. Interestingly, the bank held some EK in the fund — 2.6% of its value but sold off 1,600 shares in 1974. While it is true that the Standard and Poor index is a more superior indicator of what actually transpired during the period of time, to this court it is the less appropriate than is the Lincoln First Fund as a measuring stick, since the fund reflects exactly what performance was achieved by the bank in a reasonable and fair manner over the same period of time. The bank, itself, provided evidence on its own on how it evaluated the stock market and other desirable investments during the period it administered the Janes trust. In the Development Trust fund, the bank created an investment standard for itself which it did not live up to in administering the Janes trust. Accordingly, it is the court’s view that the bank’s own trust is the basis for its calculation of damages which is set forth in objectant’s exhibit 493 at page 6.
Objectants have requested the court to charge the fiduciary for the cost, expenses and attorney fees in the proceeding. It is this court’s view that on the state of this entire record and while the court declines to find gross negligence, that nevertheless on the basis of the imprudence, the abuse of its fiduciary position and its violation of a basic standard of conduct in such matters, that petitioner forfeits its commissions as such fiduciary and that it be liable for the cost and expenses of its own attorneys as a personal liability.
CONCLUSION
The court surcharges the petitioners in the amount of $6,080,269 plus interest at the judgment rate from October 1, 1994. Petitioner forfeits its commission and is chargeable for its own counsel fees and expenses.
[Portions of opinion omitted for purposes of publication.]