OPINION OF THE COURT
Anthony A. Scarping, Jr., S.
This is a proceeding commenced by Pamela Townley Creigh *594 ton (respondent), a granddaughter of Blanche D. Hunter (decedent), to vacate the court’s decree of February 23, 1998, judicially settling the first intermediate account of Chase Manhattan Bank (petitioner) as cotrustee of a trust created under decedent’s will for respondent’s benefit.[1] Respondent seeks to withdraw the waiver and consent she executed pertaining to petitioner’s account, and file objections thereto. Her prospective objections are based primarily on petitioner’s imprudent management of the trust’s holdings of Eastman Kodak stock in the 1970’s, as set forth in Matter of Janes.[2]
A fact-finding hearing was conducted to ascertain the circumstances surrounding petitioner’s dispatch of the waiver to respondent and respondent’s execution thereof, and whether such circumstances amounted to “fraud, misrepresentation, or other misconduct” on petitioner’s part (see, Matter of Paul, 105 AD2d 928, 929).[3] Based upon the evidence adduced, the court makes the following findings of fact and conclusions of law, and grants respondent’s application to vacate the decree and waiver.
At the hearing, petitioner presented evidence attendant to the events surrounding respondent’s execution of the waiver on July 24, 1997. The following witnesses testified: James Lieb, petitioner’s administrative officer for the trust from 1993 through March 1997; John “Jack” Fitzpatrick, petitioner’s investment officer for the trust from February 1997 through the time in question; Elliot Gumaer, a partner at the Rochester law firm of Nixon Hargrave Devans & Doyle, counsel for petitioner in connection with the preparation and filing of the *595 account in question; and Kimberly Rabideau, a trusts and estates paralegal at Nixon Hargrave at that time.[4] Respondent also testified briefly at the hearing.
According to the witnesses, as a result of the August 1996 death of the trust’s cotrustee, petitioner sought to settle its intermediate account for the trust. In September 1996, Lieb wrote a letter to respondent, advising her that: (i) petitioner would prepare a formal accounting, detailing the trust’s activities from its inception; (ii) once completed, she would have an opportunity to review the account; and (iii) she would be asked to approve or disapprove of the cotrustees’ actions during the period of the account. In February 1997, Lieb wrote a second letter to her, informing her that Fitzpatrick had succeeded John Teegardin as investment officer for the trust and her separate investment management account, and that Fitzpatrick would be contacting her in the near future to introduce himself to her. Later that month, Lieb sent another letter to respondent, informing her that she would be receiving from Nixon Hargrave an accounting, prepared by petitioner. Respondent did not respond to the foregoing letters.
In early April and in late May 1997, Fitzpatrick contacted respondent by telephone. During these conversations, Fitzpatrick and respondent discussed only the status of her investments and other business matters petitioner ordinarily handled for her. There was no discussion of the account or prospective accounting proceeding.
In the interim, Lieb gathered the information petitioner would need to complete the account. In May 1997, Gumaer received this information. Gumaer attempted to contact respondent by telephone several times to discuss the procedure attendant to the accounting proceeding, but respondent did not return Gumaer’s phone calls. Thereupon, Gumaer decided to obtain waivers and consents from the interested parties, including respondent, rather than serve a citation upon them. According to Gumaer, he made this decision without any indication from petitioner that there was an urgency to complete an accounting proceeding in light of the Janes decision, or that petitioner had any concerns about the performance of the trust’s shares in Eastman Kodak during the accounting period.
On June 20, 1997, Rabideau contacted respondent by telephone. She told respondent that petitioner would commence *596 the accounting proceeding shortly, and that respondent, as an interested party, would be receiving a package which contained a copy of the account for her review. During this conversation, Rabideau also told respondent that if she approved of the documents in the package, she should sign the waiver, which would then be filed with the court. Rabideau did not describe to respondent the meaning or import of the waiver.
On July 2, Fitzpatrick telephoned respondent to set up an appointment with her in California during a trip to the west coast he had already scheduled for later that month. During their conversation, they made an appointment to meet on the evening of July 23 at a Santa Monica restaurant. Fitzpatrick confirmed their appointment in writing later that week, without reference to the accounting proceeding or anything pertaining to the account. According to Fitzpatrick, he was unaware of Gumaer’s preparation of the account at this juncture.
On July 17, while speaking with Gumaer on a matter unrelated to the trust or the accounting, Fitzpatrick mentioned his upcoming trip to California. Gumaer told Fitzpatrick that Nixon Hargrave was preparing documents which, he had determined, needed to be personally delivered to respondent, due to his inability to contact her. Fitzpatrick agreed to deliver the documents to respondent when he met her in California. Later that day, Gumaer instructed Rabideau to prepare a package of documents, consisting of the petition, account, and an original and copy of the waiver (package),[5] and deliver those documents to Fitzpatrick. At Gumaer’s request, Rabideau then contacted Fitzpatrick and told him that she was working on the documents pertaining to the trust.
On July 18, Rabideau prepared a cover letter addressed to respondent. Therein, Rabideau: (i) reminded respondent why the accounting proceeding was going to be commenced; (ii) informed her that the package being delivered to her consisted of copies of the petition and account, and an original and copy of the waiver; and (iii) instructed her to examine the account, and if she approved of it, to sign the original waiver before a notary and return it in an envelope which was provided, or have Fitzpatrick bring it back to Rochester subsequent to their *597 meeting.[6] The letter does not address the substance or import of any of the documents in the package.
On July 21, Rabideau met Fitzpatrick briefly at his Rochester office, at which time she showed him the contents of the package. According to Fitzpatrick, Rabideau showed him the account (which exceeds 100 pages), and the original and copy of the unexecuted waiver. He did not recall seeing Rabideau’s cover letter to respondent as part of the package at that time, or at any other time.[7] Also, Rabideau told Fitzpatrick that he should have respondent sign the waiver before a notary, and, if it was convenient for him, to deliver the executed waiver to her when he returned to Rochester. Rabideau did not explain the import of the waiver to Fitzpatrick at that time.
On July 23, Fitzpatrick departed for California, taking the package and a report he had prepared, summarizing respondent’s trust and investments accounts with petitioner. That evening, after his arrival in California, Fitzpatrick went to meet respondent in Santa Monica, as scheduled. Fitzpatrick brought with him the package and the financial report. Respondent failed to appear at the restaurant that evening.
When Fitzpatrick returned to his hotel room, he received a telephone message from respondent, who explained that her absence was due to an illness.
According to Fitzpatrick, he did not intend to ask respondent to execute the waiver that evening. Instead, he merely intended to deliver the package to respondent, without discussing its contents.
The following day — July 24 — Fitzpatrick contacted respondent, and they arranged to meet at 4:30 p.m. in the lobby of the hotel where Fitzpatrick was staying, immediately prior to an engagement Fitzpatrick had already scheduled. Prior to their meeting, Fitzpatrick reviewed the two-page summary statement of the account, and the financial report he had prepared. He also located a notary public’s office at the hotel.
Fitzpatrick and respondent met, as scheduled, at approximately 4:30 p.m. They went to a coffee shop in the hotel, where they spoke for approximately one hour about a variety of personal and financial topics. At one point, Fitzpatrick asked *598 if respondent would not object to the prospective sale of some of the trust’s Eastman Kodak stock, given the stock’s long history within respondent’s family. Respondent indicated that she did not mind if Fitzpatrick sold some of the stock, as long as some remained in the portfolio.
Soon after they sat down, Fitzpatrick mentioned to respondent that he had some documents for her to sign if she was comfortable in doing so, and that at some point, they might need to go to the notary’s office before it closed. Respondent appeared to respond affirmatively, and their conversation continued.
At the outset of their conversation, the package remained in Fitzpatrick’s briefcase. A short time later, Fitzpatrick removed the package from his briefcase and put it on the table, leaving all documents enclosed within the package. Fitzpatrick did not discuss with or explain to respondent anything about the documents, since he assumed that “the other parts of the team” had done so, and that she was expecting to receive the documents.
Fitzpatrick and respondent continued their conversation, until approximately 10 minutes prior to the close of the notary’s office. At that juncture, Fitzpatrick asked respondent to accompany him to the notary’s office to sign the documents “if she was comfortable” in doing so. They immediately departed for the notary’s office, with Fitzpatrick carrying the package. When they arrived at the notary’s office, Fitzpatrick took the unexecuted waiver and its photocopy out of the package and gave them to respondent, stating, “This is the document we want you to sign.” Respondent “skimmed” the documents for anywhere from 10 seconds to one minute, and, without saying anything, executed both the waiver and the photocopy in the notary’s presence. Thereupon, Fitzpatrick took both the waiver and the photocopy, and they returned to the coffee shop and resumed their conversation for another half hour.
At the conclusion of their meeting, Fitzpatrick retained the waiver, and gave the remaining documents from the package, including the executed photocopy of the waiver, to respondent. Without examining the documents, respondent placed the entire package into her pocketbook, and then departed. Upon his return to Rochester, Fitzpatrick returned the executed waiver to Rabideau.
In opposing respondent’s application, petitioner contends that it did not commit any misconduct in sending Fitzpatrick from Rochester to California to obtain respondent’s signature *599 on the waiver. Petitioner further contends that, in any event, respondent, a mature adult with a postgraduate education in the arts, must have understood the import of the waiver when she executed it, because she previously participated in several accounting proceedings in this court.[8] The court disagrees.
A party may seek to vacate an accounting decree on the ground that a waiver and consent he or she executed was obtained through “fraud, misrepresentation, or other misconduct” (CPLR 5015 [a] [3]; Matter of Paul, 105 AD2d, supra at 930), or “any other ground tending to destroy the validity of the waiver” (Matter of Celantano, 31 Misc 2d 727; Matter of Sturges, 24 Misc 2d 14). Where the application to withdraw a waiver and consent follows the execution of a decree, the party must show that: (i) the waiver itself was obtained through fraud, misrepresentation, misunderstanding, undue influence, collusion, accident or some other similar ground; (ii) the parties can be placed in a position of status quo ante; and (iii) the proposed objections raised are meritorious (see, Matter of Frutiger, 29 NY2d 143; see generally, 1 Harris, New York Estates: Probate, Administration and Litigation § 3:92, at 3-25 [5th ed]). However, where fraud is alleged in the context of a fiduciary relationship, fraud is presumed, and the burden shifts to the fiduciary to demonstrate, by clear and convincing evidence, the absence of fraud or other misconduct (see, Matter of Greiff, 92 NY2d 341; Matter of Paul, supra at 929 [and authorities cited]).
This shifting of the burden is consistent with the longstanding tenets of law in this state pertaining to the nature of certain duties a fiduciary owes to a beneficiary. Among these duties are the duty of utmost loyalty in all instances (see, Meinhard v Salmon, 249 NY 458). Also, where, as here, the fiduciary clearly possesses superior knowledge and has benefitted from the beneficiary’s execution of a release or waiver, the transaction will not be sustained “unless the beneficiary has been given full knowledge of his [or her] rights and of all material facts and circumstances” (Matter of James, 86 NYS2d 78, 88; see, Adair v Brimmer, 74 NY 539, 554; Matter of Ryan, 291 NY 376, 417). In the instant case, the court finds that petitioner failed to fulfill this duty of disclosure to respondent.
The court is aware of the rule that a competent adult is chargeable with knowledge of the contents and effect of a docu *600 ment he or she reads and signs (see, Matter of Hall, 185 AD2d 322; Matter of Boyle, 107 AD2d 807). However, contrary to petitioner’s contentions, respondent’s previous appearances in accounting proceedings before this court, or her claim, among others, that she thought she was signing a document to assent to Fitzpatrick’s replacement of Teegardin as her trust officer are not determinative of the issue at hand. Instead, several critical facts indicate that the waiver was not knowingly and intelligently given.
Initially, the waiver itself indicates that respondent acknowledged receipt of a copy of the account — presumably for the purpose of reviewing it prior to her execution of the waiver. Petitioner, through its agent Fitzpatrick, was fully aware that respondent had never reviewed the account prior to her execution of the waiver. In fact, respondent was not given an opportunity to review the account, either with or without counsel, prior to her execution of the waiver. Also, there is no evidence that respondent ever saw the content of the cover letter prepared by Rabideau, or that anyone ever explained to her the practical effect of executing the waiver (i.e., that she was approving all of petitioner’s activities as cotrustee during the accounting period). Finally, the timing and context of Fitzpatrick’s meeting with respondent are troubling. Indeed, it is unclear why petitioner felt the need to have these documents hand-delivered to respondent, or why respondent was, in essence, required to sign the waiver before she had any opportunity to review the account. Clearly, respondent was not provided with full knowledge of her rights and of all material facts and circumstances regarding the account.
Since petitioner has failed to meet its burden of proving that the circumstances surrounding respondent’s execution of the waiver were “just and fair” (Matter of Levy, 19 AD2d 413, 417), the court’s inquiry ends there (see, e.g., Matter of Davis, NYLJ, Jan. 11, 2000, at 25, col 4 [Nassau County]), and the waiver must be vacated.
Accordingly, the court grants respondent’s application to vacate the waiver, and the decree is hereby vacated.

. The factual and procedural background underlying the 23-year period of petitioner’s account — March 27, 1973 through August 13, 1996 — and respondent’s pending application have been set forth at length in the court’s previous decision and orders of January 19, 1999 (NYLJ, Jan. 22, 1999, at 31, col 2 [Emanuelli, S.]) and July 19, 2000 (NYLJ, July 26, 2000, at 33, col 2 [Emanuelli, S.]).

. On May 1, 1997, the Court of Appeals decided Janes (90 NY2d 41), affirming determinations by the Surrogate’s Court, Monroe County (165 Misc 2d 743), and the Appellate Division, Fourth Department (223 AD2d 20), that petitioner, as corporate trustee, had acted imprudently in maintaining a large concentration of Eastman Kodak stock in the trust at issue from 1973 through 1980. During that period, the value of the Eastman Kodak shares in the Janes trust dropped to approximately one third of the shares’ date-of-death value.

. The court has accepted posthearing submissions from both parties, including proposed findings of fact and conclusions of law, and memoranda of law.

. Due to an illness, Rabideau was unable to testify at the hearing. However, upon the parties’ agreement, a transcript of her deposition testimony was admitted into evidence.

. The waiver is comparable with the standard “Waiver and Consent” form prescribed by the Office of Court Administration for accounting proceedings (Official Form: JA-3).

. Rabideau also prepared a memo to Fitzpatrick, wherein she thanked Fitzpatrick for delivering the package to respondent, and stated that if it was convenient for respondent, Fitzpatrick could deliver the executed original waiver to Rochester upon his return there.

. At her deposition, Rabideau had testified that the “cover letter” to respondent was “attached” to the package.

. At the hearing, petitioner introduced documents which show that respondent had either appeared as an objectant or executed a waiver and consent in connection with three other accounting proceedings in this court unrelated to the trust in question.