JANET L. DURANT, Appellant, v. EDWARD C. CROWLEY, Individually and as Substituted Trustee, etc., and THE FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Respondents, Impleaded with LAWRENCE T. DURANT and Others, Appellants, and WILLIAM WEST DURANT, Defendant.

First Department, July 1, 1921.

**Trusts — trustee charged with loss from investment of trust funds because of failure to exercise proper care.**

In a proceeding to compel a substituted trustee to account, *held*, that the investment by said trustee of nearly one-half of the trust fund in one mortgage on property valued at less than twice the amount of the loan and highly speculative in its nature and very difficult to rent should it become unoccupied by the mortgagor, called for more care than was exercised by the trustee, although there is nothing to impugn his good faith, and he should be charged with the amount of the loan, with interest from the time the mortgagor failed to pay interest, and upon payment thereof the property should be conveyed to him individually.

APPEAL by the plaintiff, Janet L. Durant, and defendants Lawrence T. Durant and others, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 20th day of August, 1920, on the findings and report of an official referee.

*Warren McConihe*, for the plaintiff, appellant.

*William H. Hamilton* [*N. C. Conklin* with him on the brief], for the defendants, appellants.

*Francis M. Scott* of counsel [*E. C. Crowley*, attorney in person], for the respondent trustee.

SMITH, J.:

In 1895 one William West Durant executed a trust agreement which was supplemented later by agreements in 1897 and 1898, depositing certain moneys with the Continental Trust Company, the income from which to be paid to his wife, Janet L. Durant, the plaintiff herein, for the benefit of her and the children mentioned until the children became of age,

when certain portions of the income should be paid to such children. The Continental Trust Company handled the matter for some time and then was consolidated with the New York Security and Trust Company which subsequently became the New York Trust Company. The beneficiaries under this agreement did not receive as large an income as they desired from the trust company as trustee, and when some of the children became of age and upon the application of the beneficiaries, the defendant Edward C. Crowley was substituted as trustee. One of the main reasons for such substitution was that Crowley would be more willing than the trust company to endeavor to increase the income from the trust fund. Crowley received about $64,000 upon his qualifying as trustee, $8,500 of which was by agreement between all the beneficiaries paid later to one of the beneficiaries, so that he had in hand some $55,000 which he was seeking to invest. He did invest this money, and it is concerning one of the investments of $25,000 that this litigation has arisen.

The plaintiff commenced this action to require Crowley to account, and upon a hearing an interlocutory judgment was entered directing the trustee to file his account and the proceedings upon the account, if objections were filed, should be had before an official referee. Crowley at no time objected to filing the account and so stated before the trial judge. One of the investments made by the trustee was in a $25,000 mortgage on some property in the outskirts of Yonkers, which will be described more fully hereafter. The main contest in the matter was over this investment, the beneficiaries claiming that it was improvidently made by the trustee and that he should be charged with the investment. After a lengthy trial the referee found that the property was security for the loan at the time it was made, but suggested that the trustee should have exercised greater diligence in looking into the personal qualities of the Tweedys, one of whom was the mortgagor. Upon the referee's report coming before the Special Term for confirmation, the Special Term adopted the findings of the referee and confirmed his report, which overruled the objections to the $25,000 investment and settled the accounts as rendered by the trustee.

Immediately after the appointment of the trustee in

First Department, July, 1921. [Vol. 197

September, 1909, he made several efforts to invest the fund, inquiring of different people for investments that would return six per cent, and found that he could not make investments in the city limits of New York that would pay more than four and one-half or five per cent. At the suggestion of some of the beneficiaries he investigated two or three different propositions outside the city limits, some of them at some distance from the city, but not being satisfied with them, declined to take the loans proposed. The trustee was acquainted with a man by the name of Blake who was a lawyer and in the employ at the time of the Title Insurance Company in New York city. He had been a resident of Albion, Orleans county, N. Y., the county adjoining the county in which the trustee lived before coming to New York, he being a former resident of Lockport, Niagara county. They had been well acquainted and the trustee, knowing that Blake was in the Title Insurance Company, asked him if he knew of any loans. Blake after a little time brought to him an application for the loan in question, which he learned of through a man by the name of J. L. Lewis, who was a lawyer formerly from Albion, but at the time practicing in New York. Lewis was then living near the residence of certain people named Tweedy, was acquainted with them and acted as their attorney. He knew their desire to obtain a $25,000 loan on the property and told Blake of it. Blake submitted it to Crowley and Crowley suggested to him that he get a man by the name of Snyder, an appraiser, to make a report on it, and Blake arranged with Snyder to make such report. Lewis obtained a report from another appraiser by the name of Spock residing in Yonkers. These two appraisers made reports, one of them showing a value of the property at the time of $40,000 and the other of $42,200. Crowley examined the property two or three times, going through the house and over the grounds, and conferred with several people about the general locality. He learned that there were three mortgages on the property, one of $10,000, and a second of $2,000 on three of the lots, and a $4,000 mortgage on two of the adjoining lots. He also learned that the husband of the proposed mortgagor, Mr. Tweedy, had retired from business and was interested in the development of a rubber reclaiming

process, and desired some money to put in its development, and that whatever money would remain after taking up prior liens and paying the expenses in connection with the mortgage, would go into that enterprise. The trustee had told Blake that he would have to get his commission out of the borrower, and Blake and Lewis, after some negotiation, arranged with the Tweedys that $2,000 would be paid to cover commissions and all expenses in connection with the matter. This was eight per cent. The trustee accepted the $25,000 mortgage and turned over the money in several checks to the Title Insurance Company to close the loan. There were upon the property at the time the loan was made unpaid back taxes for several years, and some tax sales on two of the plots but not on the buildings. These the trustee says he did not know were unpaid until the closing of the loan, and thinks he then saw it on the closing papers. All these taxes were paid out of the new mortgage money. Blake received as commission $1,286, which is a trifle more than five per cent commission, which was the usual commission on such loans. The trustee, Crowley, was not acquainted with the lawyer, Lewis, and did not meet him until the time of his investigation of the property in question.

The property in question consisted of five plots, each of about 50 to 54 feet frontage, aggregating 260 feet of frontage and being 139 feet in depth on one side, and about 100 feet in depth on the other. A two-story-and-a-half house with stone foundation and cemented cellar was built upon one end of the tract, being the most elevated portion of the tract, and in the rear of it was a story-and-a-half stable, the first story of which was of stone, the upper story shingled, with stalls and carriage room and rooms overhead. The portion of the plot where the house was located was some 30 feet above the grade of Prospect Drive, on which the lots fronted, and the tract sloped down along this drive, so that the narrower end of the plot came substantially to grade. On the other side of the plot from Prospect Drive there was a street at right angles to this property and upon that street were several houses. The tract had several large trees upon it and from the site of the house a view could be had across the valley over a part of Yonkers and to the Hudson and

the Palisades beyond. The immediate approach from Prospect Drive up to the house was an abrupt rocky way, as the photographs show, but there was a driveway from Prospect Drive at the southerly end. In looking at the photographs and considering the descriptions of the property given by different witnesses, it seems that the property is a very special property, that it could be salable only to people who would like a view and would be willing to take it with the disadvantage of the rock outcrop. Being a special kind of property, there would be very little demand for it for rental purposes, so that if the same should become vacant, it would be difficult to rent it. At the time the loan was made the house was in fairly good repair. It had one bathroom and a bathtub and closet in the cellar. The stable was well constructed and in good repair and was convertible into a garage. The loan in question was made in December, 1909.

The Tweedys continued to occupy the property for a time after the loan was made and paid the interest for two years and a half, when they stated they could no longer pay the interest, having had reverses, and offered to give a deed of the property. The trustee told Blake, who had made the loan for him, that he ought to take the property and endeavor to dispose of it and make good the loan. A deed was taken from the Tweedys to Blake in 1912, and Blake continued to pay some interest on the loan. Some of the taxes were paid after the making of the loan until finally the trustee foreclosed the mortgage, when Blake ceased any efforts in connection with the matter. There were then due and unpaid taxes for 1914, 1915 and 1916. The trustee and Blake after the making of the loan continued to have business relations and the trustee invested the balance of the $55,000 in five loans on Staten Island, through the instrumentality of Blake, who received commissions upon the loans. There is no question about these loans. After the making of the mortgage and about the time the Tweedys ceased paying interest, the trustee learned from them that they had rented the property for a time at $150 a month, and later at $125 a month. When the property was deeded to Blake he was unable to rent it for some time, and finally rented it on what the trustee calls a caretaking basis, the boys in the neighborhood having overrun

it somewhat and it having become dilapidated. It was rented for $65 a month to a party who took care of the property, putting in such repairs as were necessary to live in it. The real estate was assessed for taxation purposes at the time the loan was made at $9,000. The trustee learned of this valuation before he made the loan and says he inquired of people acquainted with the method of assessment and was told that assessments in that locality on *unimproved* real estate were at only about one-fifth of the value. The property in question was not unimproved. At the time the loan was made the house was about twenty years old and the stable some ten years old. The plumbing and furnace were also twenty years old. It appears from the evidence that in order to make the house salable at the present time at least $6,000 must be expended on it to bring it up to the present requirements and either that sum must be expended or someone found as a purchaser who has " vision " enough to see the desirable features of the property to be willing to pay the above sum in addition to the sum necessary to make good the trust fund. It has been impossible to find such a purchaser although the property has been in the hands of real estate agents for several years.

The immediate beneficiaries are all of full age and were all of age at the time the loan was made except one son who was about nineteen years of age. The trustee thinks he told one of the *cestuis que trust* concerning this proposed loan, but two of the *cestuis que trust* swear he did not tell them, and at least there is no positive testimony that he did. Upon the trial the plaintiff swore three experts, one of whom had no knowledge as to the values at the time the loan was made, except as he has acquired information since that time. The other two testified that in their opinion the property was of the value of from $17,500 to $18,500. The defendant trustee had four experts, one of whom was the appraiser Spock, selected by the owner Tweedy. Of the others, Snyder, the original appraiser, placed the value at $40,000. The witness Goodhart gave the value as $39,000 and the witness Howe at $33,000. These witnesses for the trustee all agree that the buildings were worth $13,000 and they differ only as to

the land value. These witnesses, both those for the beneficiaries and for the trustee, give testimony which leads to the inevitable conclusion that the property upon which the loan was made was highly speculative in value and that it would be very difficult to find a purchaser or tenant, and this is verified by the events.

This investment of $25,000, nearly one-half of the whole of the trust fund, in one mortgage and that on property highly speculative in its nature, very difficult to rent should it become unoccupied by the mortgagor, called for more care than was exercised by the trustee. Had he inquired more fully concerning the individuals obtaining the money from the loan, which the referee says he should have done, and had he inquired of the holders of the mortgages then existing on the property he would undoubtedly have learned facts which would have led him to doubt the correctness of the valuation placed on the property by his appraiser and by the property owner's appraiser. While there is nothing in the record to impugn the good faith of the trustee in making the investment in question, it must be held that the trustee did not exercise the care and foresight that an ordinarily prudent man should have exercised in his own affairs.

The judgment should be modified and the referee's report disallowed, in so far as it approves of the accounts submitted by the trustee. The interest on the $25,000 loan seems to have been paid down to June 1, 1916, and the trustee should be charged with the $25,000 loan and interest thereon from June 1, 1916. There are certain items in the account of rents received and disbursements made, from and concerning the property in question, all of which should be eliminated from said account and as the disbursements exceed the receipts by the sum of $1,102.56, the trust account should be surcharged with that sum. Upon his paying into the trust fund the said sum of $25,000 and interest from June 1, 1916, the Prospect Drive property should be conveyed to him individually. As so modified the judgment is affirmed, without costs.

DOWLING, MERRELL and GREENBAUM, JJ., concur.

Judgment modified as directed in opinion, and as so modified affirmed, without costs. Settle order on notice.