# Matter of  JPMorgan Chase Bank, N.A. (Waletzky—Rockefeller)

2025 NY Slip Op 32389(U)

July 7, 2025

Surrogate's Court, New York County

Docket Number: File No. 1960-1623/B

Judge: Rita Mella

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SCANNED

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

New York County Surrogate's Court
ACCOUNTING DEPT.

JUL 0 7 2025

FILED

--------------------------------------------------------------------------x

Accounting by JPMorgan Chase Bank, N.A., f/k/a The
Chase National Bank of the City of New York, as Trustee of
the Trust for the Benefit of Lucy R. Waletzky, Under an
Indenture Dated December 27, 1943, by

DECISION AFTER TRIAL
File No.: 1960-1623/B

JOHN D. ROCKEFELLER, JR.,

as Grantor,

and The Chase National Bank of the City of New York, as
Trustee.

--------------------------------------------------------------------------x

M E L L A, S .:

This is a contested second intermediate accounting by JPMorgan Chase Bank, N.A.

(JPMC or Trustee), as sole trustee of the trust established under an indenture (Trust Indenture)

dated December 27, 1943, by John D. Rockefeller, Jr., as Grantor, and The Chase National Bank

of the City of New York (predecessor to JPMC), as Trustee, for the benefit of his granddaughter

Lucy Aldridge Rockefeller now known as Lucy Waletzky (Trust). The court held an eight-day

bench trial to determine the objections filed by Waletzky, which allege that the Trustee (1) failed

to keep adequate records of its proceedings as Trustee; (2) breached its duty of investment

prudence; and (3) breached its duty of loyalty by engaging in self-dealing, all resulting in

substantial damages to the Trust.

Background

Grantor was the son of American industrialist John D. Rockefeller, Sr., who was a

founder of the Standard Oil Company. At its inception, the Trust, which was one of 13 trusts

Grantor established at the time for the benefit of each of his grandchildren, was funded with (1)

1,000 shares of Standard Oil Co., New Jersey, valued at $53,812.50, and 1,600 shares of Socony-

Vacuum Oil Company, Inc., valued at $19,500 (together, Oil Stocks); and (2) U.S Treasury bonds valued at $25,013.68.

Article FIRST of the Trust Indenture provides for the disposition of the Trust's assets. As pertinent here, the Trustee is directed to accumulate income for Waletzky until she reaches age 21, and thereafter, pay her the income from the Trust during her lifetime. The Trustee may also, in its discretion, distribute principal to Waletzky. As for the remainder of the Trust, Grantor provided for Waletzky to have a limited testamentary power of appointment in favor of her descendants, among others.

Article THIRD addresses the Trustee's authority with respect to investing the Trust's assets and provides that the fiduciary is:

authorized and empowered, in its sole and absolute discretion, as follows:

(1) To retain any stocks, bonds, notes, securities or other property, real or personal . . . for so long a time as it deems wise, although such investments may not be of the character permissible for trust investments by the present or any future laws applicable thereto. In exercising the discretionary powers hereinabove given with respect to the retention of investments, the Trustee shall be under no duty to sell or otherwise dispose of any particular investment or type of investment merely because of the amount or value of such investment or type of investment in relation to the total amount or value of the trust estate.

(2) To sell . . . any and all stocks, bonds, notes, securities or other property, real or personal, at any time held by it . . . for such prices, upon such terms and for such purposes as the Trustee in its discretion may deem advisable.

(3) To invest . . . in any and all such common or preferred stocks, bonds, notes, securities, or any variety of property real or personal as the said Trustee may deem advisable, whether or not such investments be of the character permissible for trust investments by the present or any future laws applicable thereto, and whether such investments be productive or unproductive, or secured or unsecured, and whether or not the investment in the stock, bonds or notes of any one corporation or association shall constitute all or the greater part of the issued and outstanding stock, bonds or notes of such corporation or association or shall constitute all or the greater part of the principal of the trust estate. . .

2

(9) To make distribution to any person entitled to a part or all of the principal or accumulated income of the trust estate in any securities or other property held by it.

In 1962, Waletzky reached age 21. The Trustee distributed all of the Trust's accumulated income, approximately $170,000, to Waletzky and accounted for its proceedings as Trustee from the date of the Trust's creation on December 27, 1943, to March 8, 1962. This accounting was uncontested and settled on a Receipt, Ratification and Release, executed by Waletzky on June 26, 1962.

Thereafter, there were no proceedings concerning the Trust until June 2012, when, on the petition of Waletzky, this court ordered JPMC to account. In accordance with the order, JPMC then filed the instant account for the period March 9, 1962 to June 30, 2012 (Account) and petition for its judicial settlement.

The only interested parties to the proceeding were Waletzky and her adult child. Upon service of the citation, only Waletzky appeared. After a prolonged period of pre-objection discovery, Waletzky filed objections in August 2016, the sum and substance of which allege that the Trustee (1) failed to generate and maintain adequate records of its proceedings during the accounting period and, as a result, adverse inferences should be drawn against it (Records Objections); (2) breached its duty to act with prudence when, beginning in 1967, it sold the Oil Stocks, and reinvested the proceeds in lower performing stocks, notwithstanding the historically "strong performance" of the Oil Stocks, the expectation that they would continue to perform "well," and the tax consequences of the sales (Prudent Investment Objections); and (3) breached its duty of loyalty and engaged in self-dealing when, upon selling the Oil Stocks, it purchased stock in various companies (Companies) over which it purportedly sought to gain power and exert influence (Self-Dealing Objections). Waletzky seeks to surcharge JPMC the amounts required "to increase the value of the Trust to what it would have been worth if the Oil Stocks

3

[* 3]

had not been sold," and "to compensate the Trust for the diminished income payments made during the Accounting Period as a result of selling the Oil Stocks." She also asks the court to deny JPMC's fees and commissions and award her interest and attorneys fees.

After Waletzky filed her objections, the parties engaged in further discovery and extensive motion practice. Eventually, the court, on consent of the parties, appointed a referee to supervise the completion of discovery. On the conclusion of this phase of the proceedings, the parties proceeded to a trial of Waletzky's objections.

Over the course of the trial, JPMC presented three witnesses: (1) Anne Dougherty, a senior trust officer and managing director with JPMC, who is the trust officer assigned to the Trust since 2008, and who is involved with the administration of 25 to 30 Rockefeller family trusts;[1] (2) Michael J.A. Smith, whom the court qualified as an expert in trust administration and fiduciary bank industry and practice; and (3) Charles F. Mason, Ph.D., whom the court qualified as an expert in economics and the oil and gas industry. Waletzky presented four witnesses: (1) Paul Charnetzki, whom the court qualified as an expert in accounting and valuation of investments; (2) Kenneth F. Joyce, a law professor whom the court qualified as a fiduciary expert in trusts and estates in New York; (3) Joseph J. Floyd, whom the court qualified as an expert in accounting and financial reporting; and (4) John J. Powers, a trust officer at JPMC from 1992 to 2006, and from 2010 through the time of trial.

The expert reports of Smith (dated October 7 and December 3, 2021), Mason (dated October 7, 2021), Charnetzki (dated December 3, 2021), and Floyd (dated October 8, 2021) were

---

[1] Three of these trusts were created by Grantor for Waletzky's benefit, including a trust created in 1934 (the largest in value of the three), a trust created in 1952 ("in the middle" in terms of value and for which JPMC is not the Trustee but has investment responsibility), and the Trust (the smallest in value of the three).

4

admitted into evidence and served as their direct testimony on the parties' consent. These expert witnesses were then cross-examined at the trial. The expert reports of Joyce (dated October 8 and December 3, 2021) were also admitted into evidence and served as his direct testimony. Joyce died shortly before the trial began and, on the parties' consent, his deposition testimony (taken on March 3 and 4, 2022) was admitted into evidence to serve as his cross-examination.

Further, although Waletzky was present throughout the trial, she did not testify. However, in excerpts of her deposition testimony that were read into the record, Waletzky testified that she has never read the Trust Indenture and that she first learned of the Trust when she was 21 years old. She testified further that during her entire lifetime, she has delegated the responsibility for supervising her assets and investments to financial professionals. For example, she testified that during the 1960s through the 1990s, the Rockefeller Family Office (RFO)[2] served as her financial advisor, and, among other things, managed and monitored her assets, received all of her financial information, and maintained her financial records.

The court also admitted into evidence 63 exhibits in addition to the expert reports noted above. At the conclusion of the trial, the parties agreed to submit written summations in lieu of closing arguments, as well as memoranda of law, all of which the court has considered.[3]

---

[2] The RFO is a private wealth management advisory firm established solely for members of the Rockefeller family, including Waletzky.

[3] The court has not considered JPMC's laches claim, as asserted in its post-trial brief, since this claim was not contained in the pleadings (*see Seligson v Weiss*, 222 App Div 634 [1st Dept 1928]).

5

<u>Findings of Fact</u>

As established at trial, the facts are as follows.

Grantor funded the Trust with approximately $100,000, of which most (about 75 percent) was invested in the Oil Stocks, with the rest in bonds. By March 8, 1962, the end date of the Trustee's first accounting, the Trust had a market value of about $495,000, with approximately 95 percent of those funds invested in the Oil Stocks.

When the Trust was established in 1943, decades before the Trustee's files were computerized, JPMC created a physical file to maintain records related to the Trust (Trust File). The Trust File was utilized to reflect how the Trust was administered from its inception through the middle 1990s, when JPMC's records became computerized.

Included in the Trust File was JPMC's investment diary (Investment Diary), which the credible evidence showed, contains contemporaneous, chronological, typed, stamped, and/or handwritten entries, reflecting the individual transactions of the Trust through 1986.[4] These entries show that JPMC utilized what is known as a Trust Investment Committee (TIC). A TIC is comprised of senior members of the trust department of a fiduciary bank and, among other things, sets investment policy, establishes lists of approved investments, reviews each trust portfolio annually, and makes recommendations to be implemented by an assigned investment officer. As shown in the Trust File, and consistent with fiduciary bank protocols, investment and administrative (trust) officers were assigned to the Trust during the accounting period.

The Investment Diary credibly shows, through stamped entries, that there were TIC reviews of the Trust on at least an annual basis from 1943 to 1968. In general, these reviews were memorialized by stamped entries stating, "TRUST INV. DEPT. REVIEW," "REVIEWED

---

[4] After 1986, the Trust File reflects a different reporting format.

6

WITH TRUST INVESTMENT COMMITTEE," or "REVIEWED WITH PERSONAL TRUST INVESTMENT COMMITTEE." In addition, the Investment Diary shows, in certain other entries, investment decisions the TIC made and the resulting investment transactions. With respect to the Oil Stocks, the Investment Diary includes the following entries:

> "2-27-47 Trust Investment Committee today approved further retention of present holdings. [with initials thereafter]"

> "11/5/56 T.I.C. reviewed oil equities held in this account today and directed no action for the present. [with initials thereafter]"

> "5/19/64 The T.I.C. reviewed the oil stocks held in this trust today. It was decided to take no action at this time. [with initials thereafter]"

Apart from these entries, the Investment Diary did not mention the retention of the Oil Stocks generally or as part of the annual TIC reviews in 1964, 1965, and 1966.

The Investment Diary reflects, however, that beginning in April 1967, JPMC began selling the Oil Stocks. Over the next 15 months, through June 18, 1968, JPMC sold over 70 percent of the Oil Stocks and used the proceeds to invest in the Companies, which represented a broader pool of industries. In addition to these sales and purchases, the Investment Diary also shows that there were TIC reviews of the Trust on August 14, 1967 and September 23, 1968. After June 18, 1968, the Investment Diary shows that the next sale of the Oil Stocks occurred in November 1968.

At the time of these Oil Stock sales, the Trust was valued at about $632,000. In June 1970, after these sales, the Trust was valued at about $328,000. In addition, from 1963 through 1968, annual dividends per share increased for both Oil Stocks. When the Oil Stocks were sold, they had been paying $23,820 annually in dividends; the Companies, however, paid $7,149 annually in dividends at or around the same time. In addition, as a result of selling the Oil

7

Stocks, the Trust incurred capital gains taxes. For the period 1967-1968, for example, the Trust paid $107,000 in capital gains taxes.

After JPMC sold the bulk of the Oil Stocks, the Chair of the United States House of Representatives Subcommittee on Domestic Finance, Wright Patman, issued a Staff Report on July 8, 1968, entitled "Commercial Banks and Their Trust Activities: Emerging Influence on the American Economy" (Patman Report),[5] which purported to analyze interrelationships between banking and other financial institutions.

The Trust File shows that after 1968, the manner in which the TIC reviews were documented changed. Rather than stamped entries in the Investment Diary, TIC reviews were recorded in separate review or work sheets. One such document, entitled "T.I.C. REVIEW SHEET," contains columns and rows for handwritten entries documenting, among other things, the date, the trust officer involved, and "TIC COMMENTS/SUGGESTIONS/DIRECTIONS" (TIC Review Sheet). As relevant here, handwritten entries under these respective columns reflect that the TIC supported continued diversification of the Trust's holdings in the Oil Stocks: "7/25/74 . . . [Officer] Buffington . . . Continue oil diversification. Pursue cultivation efforts when appropriate," and "7/20/78 . . . [Officer] Dorney . . . Continue to sell oils & Buy TIF's [trust investment funds]."[6]

---

[5] The court admitted the Patman Report into evidence as an ancient document and overruled JPMC's hearsay objection to the extent that the information in the Patman Report attributable to JPMC (identified in the Patman Report as Chase Manhattan Bank, New York) was admitted as an admission by a party and was the only relevant information in any event.

[6] In the record, the parties refer to the terms trust investment fund and common trust fund interchangeably. A common trust fund is "a group of investments that a trustee, who is responsible for two or more trusts, purchases with the funds of those trusts that are held by the trustee as trustee for the participating trusts" (Bogert's Trusts and Trustees § 677 [2025] [Note: online treatise]).

8

Additional shares of the Oil Stocks were sold in 1973 and 1976. Over the next decade, JPMC sold all the stocks in the Trust and invested all the proceeds in trust investment funds. In the 1990s, these trust investment funds were converted into mutual funds in which the Trust held shares.

As of June 30, 2012 (the end date of the instant accounting), the Account reflects principal growth of almost $2 million over the accounting period, income distributions to Waletzky of over $1.6 million, and payment of administration expenses and taxes of about $1 million.

Discussion

The burdens of proof at trial in a contested accounting are clear. The accounting party has the burden of proving that it has fully accounted for all estate assets (*see Matter of Schnare*, 191 AD2d 859, 860 [3d Dept 1993]) and makes out a prima facie case by submitting the account and supporting affidavit to the court (*see Matter of Rudin*, 34 AD3d 371, 372 [1st Dept 2006]). The objectant then bears the affirmative burden of coming forward with evidence to establish that the account is neither accurate nor complete (*Matter of Schnare*, 191 AD2d at 860). If that burden is met, the accounting party must then prove by a fair preponderance of the evidence that the account is accurate and complete (*Id.*). However, the objectant has the burden of proof as to any claims of breach of fiduciary duty (*Matter of Pollock*, NYLJ, Sept. 17, 1998, at 30, col 3 [Sur Ct, Nassau County] [objectant to trustee's accounting "bears the affirmative burden of proof on the issue of the investment practices of a trustee"]; *see also Matter of Garrasi*, 33 Misc 3d 1224[A] [Sur Ct, Schenectady County 2011] [upon trustees' filing of their account, objectant had burden to come forward with evidence of self-dealing]).

9

Here, in addition to the Account and supporting affidavit, JPMC introduced into evidence (1) the Trust File, which included JPMC's Investment Diary, and (2) transaction records for 1962-1998 (Transaction Records), which document the transactions that occurred during that period and which JPMC used as the data source to prepare that portion of the Account. Based on these submissions, JPMC met its burden to establish prima facie that the Account is accurate and complete. It was then incumbent on Waletzky to introduce evidence that the Account was, in fact, inaccurate or incomplete (*see Matter of Schnare*, 191 AD2d at 860) or that JPMC breached its fiduciary obligations.

Records Objections

There are two components to the Records Objections. According to Waletzky, JPMC "failed to account" not only because it did not generate or maintain accurate, contemporaneous records explaining the sale of the Oil Stocks and the subsequent purchase of stocks in the Companies, but also because the records JPMC did produce did not establish the accuracy or completeness of the account.

Adequacy of Records Generated and Maintained Concerning Sale of Oil Stocks

Waletzky contends that JPMC's records relating to the sale of the Oil Stocks and subsequent purchase of stock in the Companies are inadequate because (1) JPMC did not produce any records documenting the Trust management processes that the TIC followed during the 1960s generally or in connection with the sale of the Oil Stocks; (2) JPMC presented no evidence of an investment plan or the considerations that it took into account before selling the Oil Stocks, including the tax consequences of the sales, how Waletzky's interests would be affected, and the Grantor's intent as reflected in the language of the Trust Indenture; (3) the Trust File does not include documents indicating that the sale of the Oil Stocks was for diversification

10

purposes; (4) JPMC has not provided any record of its rationale for beginning to diversify the Trust's assets in 1967 or for its selection of the Companies; and (5) the Trust File contains errors and irregularities.

In general, a trustee has a duty to keep "records of receipts, payments and other transactions" (*Matter of Morris*, 8 Misc 2d 915, 916 [Sur Ct, Nassau County 1957]; *Matter of Bowne*, 8 Misc 2d 763, 764 [Sur Ct, NY County 1957]). A fiduciary must maintain clear and accurate records, and, if it does not "the presumptions are all against [it], obscurities and doubts being resolved adversely to [it]" (*White v Rankin*, 18 App Div 293, 295 [2d Dept 1897], *affd* 162 NY 622 [1900]; *see also Matter of Reckford*, 307 NY 165 [1954]; *Matter of Carbone*, 101 AD3d 866 [2d Dept 2012]).

Waletzky primarily relied on the absence of documentation as to the specifics of the process by which decisions were made regarding the administration of the Trust. However, the evidence showed that JPMC's record-keeping was not deficient by industry standards. In testimony that the court credits, Smith explained that based on his extensive industry experience, the records generated and maintained by JPMC are consistent with industry customs and practices (which are based on federal banking regulations) and with his own experience at fiduciary banks dating back to 1970. According to Smith, the records reflect JPMC's process for the Trust's administration and investment decisions in the 1960's (when most of the Oil Stocks were sold) and are consistent with records that would ordinarily and appropriately be generated as part of that process.

Further, he explained that the Trust File and other records offered into evidence show that during the 1960s, JPMC, like virtually every fiduciary bank in his experience, used a TIC to review the Trust's administration and investments on at least an annual basis. He stated:

11

That process involves senior investment officers of the bank reviewing, together with the assigned investment or administrative officer for a given account, whether the investments held in each individual trust account remain appropriate and should continue in that form based upon the trust's particular characteristics, or if changes may be recommended. By their very nature, in addition to meeting the [federal banking] mandates, TIC reviews serve as a periodic check for asset appropriateness.

Smith's testimony was corroborated by Dougherty. She testified credibly that based on her experience and review of the Trust's records here, as well as the records of numerous other trusts, JPMC's trust department in the 1960s and 1970s utilized a TIC, which would have been comprised of senior trust and investment personnel. She testified further that the TIC makes discretionary decisions regarding how trusts should be administered. Thus, for example, the TIC makes the decision whether to diversify the assets of a trust based on a review of, among other things, the trust instrument, the composition of the trust's assets, market conditions, historical data about the account, tax considerations, the categories of investments, their cost basis and market value, the annual income from the trust's investments, and the ratings of trust holdings by recognized services.

The evidence thus showed that there was a structure and methodology to the Trust's administration. JPMC made use of a TIC to administer the Trust throughout the relevant time period, and the use of a TIC, by its nature, involved an analysis by JPMC of appropriate investments for the Trust.

Regarding the specific records generated as part of this TIC process, Smith testified that, although the considerations enumerated above are inherent in the TIC review process, it is consistent with industry practice (and federal banking regulations) for the fiduciary bank not to record "[t]he 'whys' and 'wherefores' of a particular investment decision or program as may be in effect or implemented at any given time." Rather, the industry practice is to keep a record of

the resulting transactions, in the manner reflected in the Investment Diary and the Transaction Records. Dougherty's testimony was entirely consistent on this point.

Smith and Dougherty were subject to extensive cross-examination, but their testimony remained consistent, responsive, and credible. The court credits the testimony of both witnesses over the testimony of Joyce, who opined on behalf of Waletzky that JPMC should have documented "an investment plan indicating that it had conducted an analysis" before selling the Oil Stocks. Joyce, although an esteemed trusts and estates law professor with particular knowledge regarding the drafting of the Prudent Investor Act (EPTL 11-2.3), unlike Smith and Dougherty, had no experience in corporate trustee administrative or investment practices.

Based on the testimony, and the trial record, the court finds that the detailed documentation Waletzky asserts is lacking was not required to be generated as part of the TIC trust administration process (*see Matter of Knox*, 98 AD3d 300 [4th Dept 2012] [corporate trustee not required to have recorded investment objectives and strategies during 1957-2005 accounting period where records established diligent management of trust]; *Matter of Cowles*, 22 AD2d 365 [1st Dept 1965], *affd* 17 NY2d 567 [1966] [records of details of corporate trustee's actions in approving transactions not required where transaction history reflects trustee's approval]).

The cases on which Waletzky relies to support her claim of inadequate records are not to the contrary and are plainly distinguishable (*see Matter of Shulsky*, 34 AD2d 545 [2d Dept 1970] [additional records required to justify executor's late payment of taxes]; *White v Rankin*, 18 App Div 293 [trustee's records found insufficient to establish payment made to employees]; *Matter of McFarland*, 2010 NY Slip Op 33060 [U] [Sur Ct, Nassau County] [administrator's records found insufficient where accounting showed payments for written appraisals which were not

13

produced]; *Matter of O'Malley*, 2009 WL 8584477 [Sur Ct, Queens County] [attorney-in-fact breached fiduciary duty by failing to keep contemporaneous records of cash withdrawals]).

Moreover, Waletzky's assertion that certain of JPMC's records, such as the Trust File, are inadequate because they contain purported inaccuracies is unpersuasive. For example, although two documents in the Trust File do not show the same value of the Trust on June 30, 1970 ($352,000 vs. $328,417.88) and the TIC Review Sheet includes the handwritten name of one of Waletzky's cousins (in the account title line) crossed out and replaced by the handwritten name of Waletzky, the court finds these minor irregularities (of which there are only a few over a period of many years) inconsequential, particularly given that the Trust File was maintained with documents prepared manually prior to computerization of JPMC's records. Likewise, the fact that certain Investment Diary entries refer to the "Trust Investment Committee," while others refer to the "Personal Trust Investment Committee," is insignificant. The testimony of Smith and Dougherty, and the records themselves, make clear that they are the same entity.

The court is also unpersuaded by Waletzky's claim that the information in the Trust File should be afforded no weight because it is unreliable as a result of JPMC's failure to locate this file for an unspecified period of time. In 2013, the Trust File was located in JPMC's file room, outside of the section where trust files related to the Rockefeller family were kept. Contrary to Waletzky's contention, the testimony of Powers (who worked as a trust officer for JPMC on various trusts related to the Rockefeller family) that he was not aware that the Trust File existed, was not probative of the weight the court should afford to the documents in the Trust File. Powers had no recollection of having ever acted as a trust officer in connection with the Trust and, therefore, would not have had knowledge of the Trust File's existence. Further, his testimony did not raise a genuine issue regarding the bona fides of the Trust File. Rather, the

14

credible evidence established nothing more than that the Trust File had been misfiled in JPMC's file room but was ultimately found there.

The court thus concludes that Waletzky failed to offer sufficient evidence to support her claim that the records that JPMC generated and maintained for the Trust relating to the sale of the Oil Stocks and subsequent purchase of stock in the Companies are inadequate. The Records Objections related to this claim are therefore dismissed.

### Accuracy of the Account

Waletzky also maintains that JPMC failed to maintain clear and accurate records, and thus it is unable to establish that the Account is accurate and complete. As discussed above, JPMC established, prima facie, the accuracy and completeness of the Account with its submission along with the supporting affidavit (*see Rudin*, 34 AD3d at 372). The burden then shifted to Waletzky to come forward with evidence that the Account is not accurate. Although Waletzky points to what she contends are several "errors and irregularities," those are not sufficient to meet her burden.

Waletzky claims that the Transaction Records on which JPMC based the Account should be afforded no weight because Dougherty testified that she did not have personal knowledge of the Transaction Records or how they were created. However, Dougherty's lack of personal knowledge is not dispositive as to the accuracy of the Transaction Records, especially considering her credible testimony that it is JPMC's regular practice to use and rely on the same kind of transaction records to prepare accounts.

Likewise, Waletzky's reliance on a document prepared for her by the RFO, entitled "INCOME AND EXPENSES FOR YEARS 1968 AND 1967" is misplaced. The document shows a different income distribution for the year 1968 than what is reflected in the Account, but

15

Waletzky offered no evidence that the income distribution reflected in this document, which was not prepared by JPMC, was accurate or that it was based on information originating from JPMC.

As for Waletzky's assertion that the Account is inaccurate because the income distributions reflected in Schedule E-1 of the Account for the period 1970 to 1979 differ from the taxable income reported on the Trust's federal tax returns, she failed to establish that the only explanation for the inconsistency was a mistake in the Account (*see e.g. Matter of Lever*, 2010 NY Slip Op 31741 [U] [Sur Ct, Nassau County] [$500,000 correctly treated as income on account even if not reported as income on trust's tax return]).

Waletzky also argues that the Account is inaccurate because the Investment Diary reflects a sale of the Oil Stocks on January 26, 1968, while the Transaction Records reflect that the same sale took place on February 26, 1968. However, a discrepancy concerning a single transaction date does not suggest widespread errors and is de minimus in any event, particularly when the Investment Diary was created manually (*see Matter of Brownstone*, NYLJ, Mar. 16, 2000, at 31, col 3 [Sur Ct, NY County] [dismissing accounting objections as de minimus]). That the sale price for such transaction was, according to Waletzky, below the purported market price also fails to prove the Account is inaccurate without proof that the shares could not have been sold for that price. Further, her claim that the Investment Diary shows that the sale price was improperly "predetermined" at this lower price is pure speculation.

Finally, Waletzky's assertion that the Account is inaccurate because it omits reference to the broker commissions paid on stock transactions and the (transfer) taxes charged to Trust principal for each sale transaction is undermined by the credible testimony of Dougherty that such amounts are routinely reflected in the net sale price or cost basis for the transaction set forth in the Account.

16

The court thus concludes that Waletzky failed to substantiate her claim that JPMC's records are inaccurate, and that the Account cannot be deemed to be accurate and complete. Under these circumstances, the Records Objections related to this claim are also dismissed and no adverse inferences will be drawn against JPMC in connection with the Account (*see Matter of Reckford*, 307 NY at 175-76 ["Although the rule is well established that if a trustee fails to keep proper accounts, all doubts will be resolved against him and not in his favor . . . there must nevertheless be evidence showing that the trustee has failed to account"]).

Prudent Investment Objections

These objections allege that JPMC breached its duty to invest the Trust's assets in a prudent manner when it sold the Oil Stocks and diversified the Trust's holdings. Waletzky asserts that JPMC's sale of the Oil Stocks and reinvestment in the Companies (and then the trust investment funds) was "unjustifiable" at the time the sales began in 1967 and thereafter, for a number of reasons, including that the Oil Stocks were performing well and were forecast to continue to do so, the Companies were riskier investments than the Oil Stocks, the sale and reinvestment resulted in an immediate decrease in income and principal, and the sales resulted in the Trust incurring unnecessary capital gains tax. In addition, Waletzky asserts she would have received an additional $58,135,650 in income and principal had the Oil Stocks been retained for the entire 50-year accounting period. She further maintains that JPMC's conduct contravened the language of the Trust Indenture, which allowed JPMC to retain the Oil Stocks and/or to distribute the Oil Stocks in kind.

Determining the Prudent Investment Objections requires the court to examine the different standards governing the investment practices of fiduciaries during the 50-year accounting period. From 1962 until 1970, the standard for prudent investment was governed by

17

the common law rule that a trustee was "bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs" (*King v Talbot*, 40 NY 76, 85-86 [1869]; *see also Matter of Knox*, 98 AD3d at 306). In 1970, this common-law standard was codified, and the governing standard, which became known as the prudent person rule, provided that "[a] fiduciary holding funds for investment [after May 1, 1970] may invest the same in such securities as would be acquired by prudent men of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital" (EPTL 11-2.2[a][1]; *see also Matter of Knox*, 98 AD3d at 306). However, in 1995, the legislature enacted the Prudent Investor Act, which applies to all investments made or held after January 1, 1995, and provides that a "trustee shall exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument" (EPTL 11-2.3[b][2]).

Under all three standards, "the test is prudence, not performance" (*Matter of Knox*, 98 AD3d at 309, quoting *Matter of Janes*, 223 AD2d 20, 27 [4th Dept 1996], *affd* 90 NY2d 41 [1997]; *see also Matter of Bankers Trust Co. (Siegmund)*, 219 AD2d 266, 273 [1st Dept 1995] [in accounting period prior to enactment of Prudent Investor Act, "test is one of conduct rather than performance"]) and "it is not sufficient that hindsight might suggest that another course would have been more beneficial" (*Matter of Knox*, 98 AD3d 300, quoting *Matter of Bank of N.Y.*, 35 NY2d 512 [1974]; *see also Matter of Cowles*, 22 AD2d at 377).

Prior to the enactment of the Prudent Investor Act, which requires a trustee to diversify "unless the trustee reasonably determines that it is in the interests of the beneficiaries not to" (EPTL 11-2.3[b][3][C]), diversification, although not mandated, "was encouraged" (Margaret

18

Valentine Turano, Practice Commentaries, McKinney's Cons Laws of NY, EPTL 11-2.2; *see also Durant v Crowley*, 197 App Div 540 [1st Dept 1921], *affd* 234 NY 581 [1922] [under common law standard trustee properly surcharged for among other things lack of diversification]; *Cobb v Gramatan Nat'l Bank & Trust Co. of Bronxville*, 261 App Div 1086 [2d Dept 1941] [under common law standard trustee properly surcharged for lack of diversification]; *Matter of Curtiss*, 261 App Div 964 [2d Dept 1941], *affd* 286 NY 716 [1941] [under common law standard trustee properly surcharged for lack of diversification]).

Here, the evidence established that JPMC acted to diversify the Trust's holdings. Beginning in April 1967, when the Oil Stocks comprised virtually all of the Trust's assets, JPMC began its diversification plan by selling the Oil Stocks in small lots. Over the next 15 months, through June 18, 1968, JPMC sold over 70 percent of the Oil Stocks and purchased stock in the following Companies: American Air Filter Company, Inc., Boeing Company (Boeing), Columbia Broadcasting System Inc., Consolidated Freightways Inc., Delta Air Lines Inc., Eastern Air Lines Inc. (Eastern Air Lines), Giddings & Lewis Inc., International Business Machines Corp. (IBM), International Nickel Company of Canada, Ltd., Jonathan Logan Inc., Kearney & Trecker Corp., Moore Corp., Ltd., Northwest Airlines Inc. (Northwest Airlines), Robertson H.H. Company, Searle G.D. & Company, Shulton Inc. (Shulton), Syntex Corp. (Syntex), Texas Instruments Inc. (Texas Instruments), Trans World Airlines Inc. (TWA), Uarco Inc. (Uarco), United Aircraft Corp., Villager Inc., and Xerox Corp (Xerox). JPMC sold additional shares of the Oil Stocks in November 1968, and then more shares in 1973 and 1976. The notations in the TIC review sheet in 1974 to "Continue oil diversification" and in 1978 to "Continue to sell oils & Buy TIF's" further confirm JPMC's diversification plan. Although JPMC initially purchased shares in the Companies upon the sales of the Oil Stocks, starting in

19

the 1970s and into the 1980s, JPMC sold all the equities in the Trust in order to purchase trust investment funds, which were converted into mutual funds in the 1990s.

Smith and Dougherty testified that this prolonged sale activity over the course of many years, as shown in the Investment Diary, the Transaction Records, and the Account, reflects a deliberate plan to diversify the Trust's investments (*see Matter of Strong*, 133 AD3d 1292 [4th Dept 2015] [corporate trustee's plan to diversify stock concentration over period of time, from 1968 to 1972 and then from 1977 to 1979, found prudent]). Smith and Dougherty testified as well that the rationale for JPMC's diversification of the Trust's assets would have been to mitigate the risk of a catastrophic loss inherent in a portfolio consisting almost entirely of two stocks in the same industry. Although Joyce testified "the original oil stocks had been performing well" and "there was no evidence that they were likely to become a poor investment," and he further opined that the sales unnecessarily increased capital gains taxes and reduced the amount of income and principal available to Waletzky, the court credits Smith's testimony, which effectively and convincingly countered Joyce's.

Specifically, Smith testified that a diversification program, such as the one JPMC began in 1967, is not focused on short-term effects, but rather is a long-term investment plan aimed at mitigating risk. Thus, trustees would accept that there may be immediate tax consequences and short-term income and principal losses "up front," because they would then be able to invest the sale proceeds "into a portfolio, or portfolios that over time are going to come back and recoup," and protect against the "phenomenal" risk of not diversifying. In this connection, Smith's testimony made sense and was again corroborated by that of Dougherty.

Moreover, the records show that JPMC diversified the Trust's assets while the Trust underwent TIC reviews as part of the administration process. Although the Investment Diary

20

notes the TIC's decision to retain the Oil Stocks in 1947, 1956, and 1964, and does not contain a specific notation to diversify prior to the sales of the Oil Stocks in 1967, according to the testimony of Smith and Dougherty, annual TIC reviews, which occurred in the years prior to and during the sales of the Oil Stocks (1965, 1966, 1967, and 1968), would have incorporated a review of the appropriateness of the Trust portfolio even without a specific notation to that effect. Nonetheless, the TIC Review Sheet specifically noted that in 1974 and 1978, JPMC was continuing to diversify the Trust's holdings upon the TIC annual review.

Under these circumstances, the court concludes that Waletzky did not meet her burden to establish that JPMC failed to invest the Trust's assets in a prudent manner. Indeed, the evidence established that JPMC's conduct amounted to nothing more than the effectuation of a long-term diversification plan enacted upon TIC review. There is simply no basis in the record to conclude that JPMC's diversification of the Trust's highly concentrated portfolio of two Oil Stocks violated the governing investment standards for fiduciaries (*see Matter of Bank of N.Y.*, 35 NY2d 512 [1974] [corporate trustee acted prudently as a matter of law with respect to investments between 1964 and 1968 where process included use of TIC]). To the extent that Joyce opined to the contrary, the court discredits that opinion.

In reaching this conclusion, the court considered Waletzky's remaining arguments and found them insufficient. That the Oil Stocks may have ultimately performed well after they were sold is not dispositive. Hindsight is not a basis on which to conclude JPMC acted imprudently (*see Matter of Knox*, 98 AD3d at 306). Moreover, while the Trust Indenture authorized JPMC to retain the Oil Stocks or distribute them in-kind, it was not required to do so. Rather, the Trust Indenture afforded JPMC sole and absolute discretion in making investment decisions. Thus,

21

JPMC's decision to diversify by selling the Oil Stocks in no way contravened the language of the Trust Indenture.

Similarly unavailing is Waletzky's contention that the concentration of Oil Stocks in the Trust did not justify diversification because JPMC should have considered all of Waletzky's assets, including the assets of other trusts in which she had an interest and her personal asset portfolio. Apart from the fact that Waletzky cites no authority for this proposition, it is not supported by the language of the Trust Indenture.

Nor is the court's conclusion undermined by JPMC's expert Mason's failure to testify that he had personal knowledge that JPMC's actions were in fact motivated by volatile market conditions that had an impact on the oil industry at the time JPMC sold the Oil Stocks. Such a connection is not dispositive of whether JPMC acted prudently considering the credible and convincing testimony of Smith and Dougherty that JPMC would have diversified to mitigate the risk of a catastrophic loss associated with the Trust's near 100 percent concentration in the Oil Stocks.

Moreover, the cases on which Waletzky relies are inapposite as they involve factual circumstances not present here (*see Matter of Knox*, 98 AD3d 300 [corporate trustee's retention of concentrated stock positions found prudent where stock was main source of income for trust and stated purpose of trust was to provide for income beneficiaries]; *Margesson v Bank of N.Y.*, 291 AD2d 694 [3d Dept 2002] [corporate trustee's motion for summary judgment to dismiss objections to sale of trust holdings denied under Prudent Investor Act where trustee's actions in connection with sale contradicted its own practices]; *Matter of Wood*, 177 AD2d 161 [2d Dept 1992] [corporate trustee acted imprudently where, upon termination of trust, it sold entire trust portfolio without notice to remainder beneficiary]).

22

Accordingly, the court concludes that Waletzky has failed to meet her burden to establish that JPMC acted imprudently in the investment of the Trust's assets, and the Prudent Investment Objections are thus dismissed.

Self-Dealing Objections

These objections allege that JPMC breached its duty of loyalty by making investment decisions for its personal gain. Without a doubt, as Trustee, JPMC owed a duty of undivided loyalty that required it to administer the Trust solely in the interest of the beneficiaries (*see Matter of Heller*, 6 NY3d 649 [2006]). Waletzky asserts that JPMC's sale of the Oil Stocks and investment in the Companies was not done to diversify and protect the interests of the Trust's beneficiaries, but, rather, was done to further JPMC's own interests in amassing controlling stock positions in the Companies, at least with some of which it was conducting or wished to conduct commercial business.

To support her assertions, Waletzky relies heavily on the Patman Report. For example, she claims that the Patman Report found that JPMC was amassing controlling stock positions in certain of the Companies, in that it found that JPMC purportedly held voting rights over 8.5 percent of Boeing stock, 8.7 percent of Texas Instruments stock, 7.7 percent of TWA stock, and 6.3 of Eastern Air Lines stock.[7] She maintains further that the Patman Report, as well as certain newspaper articles, trust indentures between the Trustee and certain of the Companies, and annual reports of JPMC and certain of the Companies from the 1960s and 1970s, established that, during the relevant time period, JPMC had business relationships with at least some of the

---

[7] In accordance with its ruling, as noted above, to the extent that this information may be attributed to JPMC, the court considered it. However, the court did not consider certain other statements in the Patman Report upon which Waletzky relies, because they were not attributed to JPMC and are not relevant in any event.

Companies, including Texas Instruments, IBM, Xerox, Shulton, Syntex, and Uarco, and, in particular, with Companies in the transportation and airline industry, including Boeing, TWA, Eastern Air Lines, and Northwest Airlines. Waletzky contends that from the time JPMC began to sell the Oil Stocks, in April 1967, until the release of the Patman Report, in July 1968, JPMC spent 56 percent (of the total amount of the Trust's assets that it used to buy stocks during this period) on the purchase of stocks of Companies with which it was purportedly doing business, and 35 percent on transportation and airline stocks (some of which JPMC was purportedly doing business with). In addition, according to Waletzky, once the Patman Report was released, on July 8, 1968, JPMC "abruptly" stopped selling the Oil Stocks, without explanation. She claims this implies that the Patman report "pulled the curtain back" on JPMC's "self-interested investment decisions using assets of [the Trust] and other funds it managed."

However, the evidence upon which Waletzky relies to support her assumptions is largely unreliable and fails to establish any connection between JPMC's investment decisions and its commercial banking services. For example, the portions of the Patman Report that were admitted into evidence were undermined by the testimony of David Rockefeller, then-Chair of JPMC's predecessor Chase Manhattan Bank, and Waletzky's uncle, at Congressional hearings held in 1971, which highlighted imprecision in the Patman Report's characterization of data regarding JPMC's voting rights in the Companies. In addition, although, in 1971, Patman sponsored legislation seeking to reform fiduciary banking regulations based, at least in part, on the Patman Report, no such legislation was ever enacted. Accordingly, the court gives little weight to the Patman Report as a basis to support Waletzky's claims.

In addition, Waletzky did not offer any evidence that JPMC invested the Trust's assets in any of the Companies because of commercial relationships it may have had or wished to have

[* 24]

with them, or that those in JPMC's trust department were even aware of any such commercial relationships. Rather, her argument amounts to pure speculation, which cannot form the basis of the court's findings (*see Matter of Bankers Trust Co. (Siegmund)*, 219 AD2d at 276).

Indeed, Smith testified that federal banking regulations in place at the time led to implementation across the industry of an "ethical wall," which prevented trust departments from considering the bank's commercial banking relationships. The existence of JPMC's use of these practices during the contested period was corroborated by the testimony of David Rockefeller, given at Congressional hearings in 1971 in connection with Patman's proposed legislation, that:

> The trust and fiduciary investment functions of our bank are performed by departments that are wholly separate and distinct from our commercial lending activities . . . there is no flow, or incidental communication of inside information, from the commercial departments or divisions of the bank to the fiduciary investment department or to the pension or personal trust divisions of the trust department. . . . Decisions on what securities to buy and sell, and when to do so, are made by our trust investment committees and portfolio managers acting under the committees' instructions. These committees . . . are guided solely by their professional judgment as to what is in the best interests of the accounts they are responsible for managing. . . . I would emphasize that bank trust departments are obligated to manage trust holdings in the best interests of their customers – not to use the stock held in a fiduciary capacity to wrest control of corporations.

Under these circumstances, there is no basis in this record for the court to find that the persons in JPMC's trust department at the time were even aware of any business relationships JPMC may have had or wished to have with the Companies (*see Matter of Strong*, 41 Misc 3d 1231[A] [Sur Ct, Monroe County 2013], *mod on other grounds*, 133 AD3d 1292 [no self-dealing by corporate trustee where no evidence corporate trustee made investment decisions based on potential business relationships and trust department was considered "a 'separate entity' from the rest of the bank"]; *Connell v Chase Manhattan Bank, N.A.*, 1981 NY Misc Lexis 3519 [Sup Ct, NY County] [no breach of fiduciary duty by bank serving as investment advisor to trustees of pension fund from 1964-1970 where bank's investment officers advised trustees to purchase and

retain stock in company with which bank had commercial relationship and ethical wall separated knowledge of investment officers from that of commercial officers of bank]).

Nor did Waletzky offer any evidence to support her theory that the reason JPMC did not sell the Oil Stocks after June 1968 (until it sold 200 shares in November 1968 and then additional shares in 1973 and 1976) was the release of the Patman Report. Indeed, there was no evidence that any persons in JPMC's trust department were even aware of the Patman Report.

The court is also unconvinced by Waletzky's contentions that certain conduct of JPMC established that diversification was not JPMC's motive in selling the Oil Stocks and purchasing stock in the Companies. For example, although Waletzky asserts that the fact that JPMC sold other Trust assets two days before selling the Oil Stocks shows that JPMC's motivation was not diversification of the Oil Stocks, Smith noted that the sale of these minor holdings, which comprised only about two percent of the Trust's value, was merely "housecleaning." In addition, while Waletzky maintains that if diversification was JPMC's motive, it would have provided prior notice to or consulted with her prior to the sale of the Oil Stocks, nothing in the Trust Indenture required JPMC to consult with the Trust beneficiary about investment decisions prior to the sale, or at any time. Contrary to Joyce's opinion that advance notice should have been provided, Smith's testimony established that since the Trust Indenture did not require such consultation, it would not have been customary for a trustee to do so at the time the Oil Stocks were sold.[8]

---

[8] In this regard, Dougherty's testimony that "today perhaps [JPMC] would" under similar circumstances advise a Trust beneficiary in advance of an impending sale is not inconsistent with the testimony of Smith and is not a basis for the court to reach a different conclusion in any event.

The court is similarly unpersuaded from the facts on which Waletzky relies[9] that JPMC was motivated by interests other than diversification.[10] The testimony of Smith established that these actions were not contrary to a diversification program, especially given that JPMC had sole and absolute discretion to make investment decisions under the Trust Indenture. The court credits Smith's testimony in this regard.

Contrary to Waletzky's theories on JPMC's motivation, as noted above, the records and credible testimony establish that JPMC simply acted to diversify the Trust's assets to protect its beneficiaries. Under these circumstances, the court concludes that Waletzky failed to meet her burden to show that JPMC breached its duty of loyalty. Accordingly, the Self-Dealing Objections are dismissed.

The court finding no liability, it need not reach the issue of damages presented in the testimony of Floyd or consider the other relief sought.

In view of the court's determination of the issues, JPMC's oral application made at trial for judgment as a matter of law (CPLR 4401), on which the court previously reserved decision, is denied as moot (*see D.A. v B.E.*, 6 Misc 3d 1032[A] [Sup Ct, Queens County 2005]; *Steck v Sushkiw*, NYLJ, Feb. 15, 2018, at 26 [Civ Ct, NY County 2018]).

---

[9] These facts are that JPMC (1) sold shares of only one of the Oil Stocks for several months before selling any of the shares of the other Oil Stock, (2) upon the sale of the Oil Stocks, invested in the Companies, rather than investing directly into trust investment funds, (3) sold all of the Oil Stocks rather than retaining a non-concentrated portion, and (4) purchased numerous stocks in Companies related to the airline industry.

[10] Waletzky's assertion that a purported admission by JPMC's predecessor in 1996 that there are circumstances where diversification may not be warranted has no bearing on JPMC's motive in this case.

27

The court having dismissed Waletzky's objections, JPMC is directed to settle its accounting decree.

Dated: July 7, 2025

_____
~~SURROGATE~~
Surrogate

28

[* 28]